708 A.2d 88

In the Matter of the ADOPTION OF CHARLES
E.D. M., II and Ashley Rebecca M.

Appeal of APRIL D., Natural Mother.

Supreme Court of Pennsylvania.

Argued Sept. 18, 1997.

Decided March 27, 1998.

Reargument Denied May 14, 1998.

596

---

Mary E. Bower, Pittsburgh, for April D.

Michael J. Visnosky, Jeffrey J. Cole, Erie, for Charles and Jean Meybin.

Thomas Kubinski, Erie, for Charles E.D. Meybin, II and Ashley Rebecca Meybin.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION

NEWMAN, Justice.

April D. challenges the termination of her parental rights to her two children, twelve-year-old Charles E.D. M., II (Charles II) and eleven-year-old Ashley Rebecca M. (Ashley). We reverse.

### FACTS

April D. and Charles M. were married in 1984. The couple subsequently had two children. Charles II was born on June 4, 1985, when April D. was twenty-two years old and Charles M. was thirty-seven years old. Their second child, Ashley, was born one year later, on July 15, 1986.

In September of 1987, the two parents separated and Charles M. was awarded custody of the two children. In 1988, April D. and Charles M. were divorced. Two years later, on May 5, 1990, Charles M. married Jean M. The two children have lived continuously with their father since the separation. On August 28, 1990, Charles M. moved with the two children and his wife from Pittsburgh to Erie, Pennsylvania because Jean M. is from Erie. They subsequently built a new house with "a combination of [Jean M.] and [his] money." Notes of testimony (N.T.), May 31, 1995 at 31. Subsequently, April D. moved to Maryland and then to Rhode Island. April D. has not seen the children since they moved to Erie.

### PROCEDURAL HISTORY

On January 23, 1995, April D. called Charles M. and requested that he cooperate with her to make arrangements for a summer visit with the children. She then retained an attorney who wrote a letter to Charles M.'s attorney on March 3, 1995, requesting summer visitation with the children. On March 31, 1995, Charles M. filed a petition to terminate April D.'s parental rights pursuant to 23 Pa.C.S. § 2511. A hearing

was held in the Court of Common Pleas of Erie County (Orphans' Court) on May 31, 1995.

At the hearing, Charles M. described his relationship with April D. after their separation and divorce as acrimonious. While separated, he stated that he involved the police during visitation transfers with April D. because he "needed the police present just to keep from causing a scene," although he did not explain what he meant. N.T. at 40–41.

Charles M. testified that after he moved to Erie, five years before this hearing on termination of parental rights, April D. had telephoned his house nine or ten times. He testified that he raised his voice and became emotional when April D. telephoned. Additionally, he stated that he hung up on April D. several times and that she spoke to Ashley twice and Charles II once. Jean M., his wife, confirmed his testimony concerning the number of phone calls and that she too would hang up on April D. Both Jean and Charles M. testified that April D. had not visited the children since August 28, 1990.

April D. appeared at the hearing and testified to oppose the petition to terminate her parental rights and to explain her behavior in failing to visit the children for five years. She described her relationship with Charles M. from the time of their separation in September of 1987 until Charles M.'s move to Erie in August of 1990, as "extremely hostile." She elaborated as follows:

There was [sic] police involved, there were public scenes, KinderCare was involved. Every time the children were either picked up or brought somewhere, my husband would make a scene to the point when he was involved with Jean, they would drop them off five houses up the street because they didn't want to drop them off in front of the house and this went on continuously with him.

N.T. at 94. She also contended that one of the incidents became physical:

I dropped off the children one night and he beat me up outside the house. He kicked me in the face, kicked me in the back, kicked me on the ground. I was then taken to the

hospital, ... And that's how KinderCare came into play, that that would be the intermediary place to pick up the children without seeing him and taking his physical beatings, his verbal abuse.

N.T. at 95. After that incident, she stated that Charles M. involved the police in the exchanges with the children and even implicated April D. in a "drug scandal," although no criminal charges were ever filed.[1] N.T. at 99.

April D. allowed the children to live with their father because she had no money and he was very well off financially. N.T. at 109. She testified that after the children moved to Erie with Charles and Jean M., she called at least every three to four months, and each time Charles M. would be "irate" and "accusatory." N.T. at 96–97. April D. also stated that she never received a response to any of her phone calls to Charles M.'s attorney. When asked why she never went to Erie to see the children, April D. testified that in 1993, Charles M. threatened to call the police if she ever came to Erie. N.T at 99. She explained as follows: "My husband has set me up on many occasions to be arrested, bringing criminal charges, everything under the sun. I was not coming to Erie to be arrested and land in jail and be stuck up here in his world ..." N.T. at 100.

April D. testified that she sent presents and cards to the children through her mother. N.T. at 110. She explained her reason for using her mother as a conduit as follows: "I knew my husband would not give them to them. Things I would give the children during the separation and divorce, he would actually throw them out, not allow them to wear the clothes, not to play with the toys. He would throw things out. He would burn things." N.T. at 110.

She stated that she finally contacted a lawyer in 1995, because she "was getting nowhere by telephone." N.T. at 91. April D. repeatedly testified that she did not want to take the children from her husband, or regain physical custody of them, she just wanted to visit them. N.T. at 103, 106, 133.

1. The record contains no further explanation of these events.

She explained that she believes that the most important time in the developmental process of a child is the years from three to ten years old and therefore "it was the most crucial time that they do have a sense of normalcy to a degree to become individuals, to become people, and not to be torn between the hatred of two people and robbed of their childhood." N.T. at 140. She concluded her testimony by stating, "I made the choice in my heart to let them go with Jean and my husband to have a normal life...." *Id.*

On July 5, 1995, the Orphans' Court entered a decree that terminated April D.'s parental rights. Following the denial of April D.'s exceptions, the Orphans' Court entered a final decree on August 4, 1995.

April D. filed an appeal to the Superior Court raising the issue of whether the evidence supported the Orphans' Court decree that termination of her rights would serve the needs and welfare of the children. The Superior Court affirmed the Order of the Orphans' Court.

April D. filed a petition for allowance of appeal, for which this Court granted allocatur to consider the issue of whether there was sufficient evidence to support the Order of the Orphans' Court terminating the parental rights of April D.

## DISCUSSION

■ April D.'s parental rights were terminated pursuant to Section 2511(a)(1) of the Adoption Act, which provides, in part, as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child....

23 Pa.C.S. § 2511. In cases of involuntary termination of parental rights, an appellate court reviews whether competent evidence supports the trial court's decree. *Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (1994).

▮▮▮▮ To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. *Id.* The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Adoption of Atencio*, 539 Pa. at 166, 650 A.2d at 1066. It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination. *In re Bowman*, 542 Pa. 268, 666 A.2d 274 (1995) (Zappala, J., Opinion in Support of Reversal); *In re K.C.W.*, 456 Pa.Super. 1, 689 A.2d 294 (1997); *Adoption of Dale A.*, 453 Pa.Super. 106, 683 A.2d 297 (1996); *Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988).

Here, Charles M. established that April D.'s contact with the children was very minimal during the five years preceding the filing of his termination petition. At the most, she called a few times and sporadically sent several packages through her mother. During this period April D. never saw her children. Accordingly, the Orphans' Court determined that April D. "entirely failed to perform parental duties for a period in excess of four years." Orphans' Court Opinion, July 7, 1995 at 3.

■ Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties. *Baby Boy A. v. Catholic Social Services,* 512 Pa. 517, 521–523, 517 A.2d 1244, 1246 (1986). Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties. Therefore, the fact that in 1995, April D. hired an attorney to request summer visits with the children and continued to make phone calls to the home in Erie is of no moment with regard to meeting the requirements of Section 2511(a)(1). Those requirements have been met by the Orphan Court's finding, supported by evidence in the record, that April D. failed to perform parental duties.

■ Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). *Adoption of Atencio.*

With respect to April D.'s explanation for her conduct, she asserted that she did not visit the children because of Charles M.'s intimidation and threats. However, the Orphan's Court made the following finding:

There is ... no credible evidence that the father effectively prevented the mother from seeing her children. While it is clear that he was extraordinarily antagonistic towards her, there is nothing in the record to indicate conduct that would justify or explain [April D.'s] almost complete manifestation of lack of interest.

Orphans' Court Opinion, July 7, 1995, at 3.

Regarding April D.'s post-abandonment conduct, the trial court found:

While [April D.] maintains that she discussed the matter with an attorney who took some steps, there is no evidence

in the record of any substantial effort to pursue visitation of even the most rudimentary nature.

Orphans' Court Opinion, July 7, 1995, at 2–3.

The Orphans' Court found that April D. failed to perform parental duties, did not adequately explain the reason for her conduct and neglected to take necessary steps to visit her children after abandoning them. In apparent recognition of the fact that the Orphans' Court's findings are based on competent evidence, April D. has not challenged them, although the record could support an opposite result. *Adoption of Atencio.* However, April D. does raise the adequacy of the Court's consideration of the factors set forth in Section 2511(b).

Pursuant to the express mandate of Section 2511(b), a court must give "primary consideration to the needs and welfare of the child." 23 Pa.C.S. § 2511(b).[2] This Court recently considered the importance of satisfying Section 2511(b) in *Adoption of Atencio.* Barbara Landis and Dante Atencio were married from September 1975 to 1986. During their marriage, they lived in California and had three children together. The youngest child, Christopher, was born four days before their divorce became final. Several months later, Landis moved to Pennsylvania with Christopher and the couple's two other children. Then, in 1990, Landis filed a petition for the involuntary termination of Dante's parental rights to Christopher.

The orphan's court in *Atencio,* although it held that Atencio had failed to perform parental duties for a period of six months as set forth in Section 2511(a)(1) of the Adoption Act, found that the record was entirely devoid of evidence concerning the effect of the termination of Atencio's rights on Christopher. Without such information, there was no way to assess the child's welfare and needs as Section 2511(b) requires. The Superior Court vacated the orphan court's order and remanded the case. We reversed the Superior Court because we found the lack of evidence demonstrating that the termination

---

**2.** The December 20, 1995 amendment to Section 2511(b) provides that the court give "primary consideration to the developmental, physical and emotional needs and welfare of the child."

would serve Christopher's needs and welfare, as required by Section 2511(b), particularly persuasive.[3]

Like the mother in *Atencio*, Charles M., in this case, here did not produce any evidence concerning the effect that the termination of April D.'s parental rights would have on the two children. Instead, both Charles and Jean M. testified concerning how this termination would provide finality in their own lives and they said almost nothing about how the termination of April D.'s parental rights would effect either child's well-being. Therefore, the Orphans' Court did not have competent evidence to make a proper determination pursuant to Section 2511(b).

Moreover, this Court has noted that the termination should serve the best interests of the child. *In Re Bowman*, 542 Pa. 268, 666 A.2d 274 (1995). In *Bowman*, where this Court affirmed the Superior Court's decision to reverse an orphan's court order terminating a father's parental rights, Chief Justice Flaherty noted in the Opinion in Support of Affirmance as follows:

> Although the record demonstrates appellee is far from a good parent, appellee's conduct does not constitute quite the requisite clear, direct, weighty and convincing evidence which shows a settled purpose of relinquishment of parental claim for at least six months prior to the filing of the petition, and it is not clear that termination would serve the best interests of the child.

*Bowman*, 542 Pa. at 269, 666 A.2d at 275.

We cannot underestimate the importance of a child's relationship with his or her biological parent. Here, April D. does not seek to take the children from their home or family, but she is requesting visitation rights through which she may maintain a presence in the children's lives. This contact will

---

3. We also noted several obstacles that made the exercise of parental duties in *Atencio* difficult; (1) Atencio lived in California and Christopher in Pennsylvania; (2) Landis refused to accept correspondence and presents sent by Atencio; (3) Landis refused to permit Christopher to speak on the phone with Atencio; and (4) Atencio had a drastically reduced income.

allow the children to continue to feel loved by their mother and receive her guidance and nurturing. Further, it may preclude the children's painful search for their biological mother as a teen or an adult and the emotional injuries caused by the separation. *See generally,* Betty Jean Lifton, *Lost & Found: The Adoption Experience* (1988).

## CONCLUSION

■ Because the record lacks competent evidence that termination of April D.'s parental rights would serve the needs and welfare of Charles M. II and Ashley M., we find that the Orphans' Court erred in terminating those rights.

Accordingly, we reverse the Order of the Superior Court.

ZAPPALA, J., concurs in the result only.