J-S24012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.J.L.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.L.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 7 MDA 2018 |

Appeal from the Decree November 30, 2017
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-0144

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.L.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.L.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 16 MDA 2018 |

Appeal from the Order November 30, 2017
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000004-2016

BEFORE:  OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED MAY 25, 2018**

R.L.M. ("Father") appeals from the decree and order entered November 30, 2017, granting the petitions filed by the York County Children, Youth and Families Agency ("CYF" or the "Agency") to involuntarily terminate his parental rights to his minor male child, A.J.L.G. ("Child" or "minor child") (born in

January of 2009),[1] pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511, and to change Child's permanency goal to adoption, with a concurrent goal of placement with a legal custodian (non-relative), pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. We affirm.

On August 22, 2017, the Agency filed petitions for the involuntary termination of Father's and Mother's parental rights to Child. On August 28, 2017, the trial court appointed Attorney Kelly McNaney as Child's legal counsel, and re-appointed Attorney Daniel Worley as Child's guardian *ad litem*. *See In re: Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (initially filed on March 28, 2017). In the same order, the trial court re-appointed Attorney Scott Beaverson to represent Father, and re-appointed Attorney Charles Hobbs to represent Mother.

On November 13, 2017, the trial court held a hearing on the petitions, at which Father was present and represented by counsel, as was Mother. Both the legal counsel and the GAL appointed for Child were also present.

The trial court set forth the factual background and procedural history of this appeal as follows.

> The entire dependency record for [Child], docketed at CP-67-DP-004-2016, was incorporated into the hearing record. The stipulation of counsel was filed on November 13, 2017 and was signed by counsel for the Agency, the guardian *ad litem*, counsel for Mother, counsel for Father, and counsel for [Child]. The stipulation of counsel was incorporated into the hearing record for the minor child, along with Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

---

[1] Child's mother, G.L.G. ("Mother"), has not appealed the termination of her parental rights and is not a party to these proceedings.

and 11 for the Agency. Based upon the testimony and evidence presented at the hearing, as well as the history of this case, the petition to change court ordered goal and the petition for involuntary termination of Mother's and Father's parental rights are GRANTED as to [Child].

## FINDINGS OF FACT

1. The minor child was born [in January of] 2009.

2. The natural mother of the minor child is [Mother], whose current address is [in] York, Pennsylvania[.]

3. The father of the minor child is [Father], whose current address is [the same York, Pennsylvania residence as Mother.]

4. A Certification of Acknowledgement of Paternity for the minor child was filed on August 29, 2017, and indicates that there is not a claim or Acknowledgement of Paternity on file for the minor child.

5. In an order entered by the Honorable Joseph C. Adams, President Judge, Court of Common Pleas, dated February 14, 2017, [Father] was determined to be the biological father of the minor child.

6. A petition for involuntary termination of parental rights and a petition to change court ordered goal were filed on August 22, 2017 by the Agency.

7. [The family's involvement with the Agency commenced when a]n Application for emergency protective custody was filed by the Agency on January 7, 2016. [The application alleged that the Agency received a referral due to concerns about Mother's mental health as well as allegations of sexual abuse of Child by Mother.]

8. In an order for emergency protective custody dated January 7, 2016, sufficient evidence was [found] that continuation or return of the minor child to the home of Mother was not in the best interest of the minor child. Legal and physical custody of the minor child was awarded to the Agency. The minor child was to be placed in foster care.

9.  In a shelter care order dated January 19, 2016, sufficient evidence was presented to prove that continuation or return of the minor child to the home of Mother was not in the best interest of the minor child. Legal and physical custody of the minor child was awarded to the Agency. The minor child was to remain in foster care.

10. A dependency petition was filed by the Agency on January 21, 2016

11. On March 1, 2016, the minor child was adjudicated dependent. Legal and physical custody were awarded to the Agency. The minor child was to remain with the emergency caregiver. The goal initially established was return to a parent or guardian.

12. The minor child has remained dependent since March 1, 2016 and the minor child has not been returned to the care and custody of Mother and Father since January 7, 2016.

13. Family Service Plans were prepared and dated as follows:

    a. Initial Family Service Plan dated January 28, 2016.

    b. Revised Family Service Plan dated July 22, 2016.

    c. Revised Family Service Plan dated February 21, 2017.

    d. Revised Family Service Plan dated August 1, 2017.

14. In a permanency review order[s dated August 22, 2016, February 21, 2017, and July 25, 2017 the trial court] made certain findings and conclusions, including, but not limited to:

    a. There had been minimal compliance with the permanency plan by the Mother and no compliance with the permanency plan by Father.

    b. Reasonable efforts had been made by the Agency to finalize the permanency plan.

    c. Mother had made minimal progress toward alleviating the circumstances which necessitated the original

placement and Father had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of the minor child were confirmed with the Agency.

e. There continued to be a need for placement of the minor child outside the care and custody of the Mother and Father.

15. [F]ather participated in a Psycho Sexual Evaluation performed by Tracy Holmes on August 17, 2017.

16. [M]other participated in a Parenting Capacity Assessment prepared by Dr. Jonathan M. Gransee dated January 12, 2017.

17. A Pressley Ridge Family Engagement Services Team opened with the family on November 1, 2016, and closed unsuccessfully on March 29, 2017.

18. A Catholic Charities Family Therapist opened for services with the [] family on March 31, 2016, and closed unsuccessfully on August 17, 2016.

19. A Catholic Charities Family Advocate began working with the [] family on April 5, 2016, and closed unsuccessfully on September 8, 2016.

20. In an Outpatient Psychiatric Treatment Plan dated December 21, 2016, prepared by Dr. Valentine Krecko and Lisa MacKillop, the minor child was diagnosed with unspecified adjustment disorder, unspecified communication disorder, and child neglect, confirmed, initial encounter. []

21. The minor child attends school in a life skills classroom through the Dallastown Area School District.

22. The minor child currently participates in speech therapy both in and out of the school environment.

25. The minor child is limited in his ability to meet his basic needs as well as his ability to effectively interact with other adults and minor children.

26. There had been no drug and alcohol issues raised as it relates to either Mother or Father.

27. Neither Mother nor Father are [sic] currently on probation or parole.

28. Both Mother and Father currently receive disability.

29. A pre-adoptive resource has been identified for the minor child.

Trial Court Opinion, 11/30/17, at 1-7 (emphasis in original).

On November 30, 2017, the trial court entered the decree granting the petition to involuntarily terminate Father's parental rights to Child pursuant to the Adoption Act, 23 Pa.C.S. § 2511, and the order changing Child's permanency goal to adoption, with a concurrent goal of placement with a legal custodian (non-relative), pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.

On December 29, 2017, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal. In his brief, Father raises the following issues:

I. Did the trial court commit reversible error in involuntarily terminating the parental rights of the natural father?

II. Did the trial court commit reversible error in changing the goal of a juvenile dependency proceeding from family reunification to adoption?

Father's Brief at 5.

Initially, we discuss the sufficiency of the evidence to support the goal change, as the trial court initially discussed the goal change issue in its opinion. Our standard of review in a dependency case follows:

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (Pa. 2015).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007), *citing* 42 Pa.C.S. § 6351(f).

Additionally, section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

**(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

* * *

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. ***See In re Sweeney***, 574 A.2d 690, 691 (Pa. Super. 1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." ***In re E.F.V.***, 461 A.2d 1263, 1267 (Pa. Super. 1983) (citation omitted).

***In re K.C.***, 903 A.2d 12, 14-15 (Pa. Super. 2006).

The trial court stated the following with regard to goal change:

**I. Petition for Change of Goal**

Before the Court can change the goal for a child in a juvenile dependency action, the Agency must prove by clear and convincing evidence that the change of goal would be in the child's best interest. ***In re Interest of M.B.***, 674 A.2d 702 (Pa. Super. 1996). In making a disposition, the [trial court] should consider

- 8 -

what is best suited to the protection and physical, mental, and moral welfare of the child. 42 Pa.C.S.A §6351; *In re Davis*, 465 A.2d 614, 619 (Pa. 1983). In rendering a disposition "best suited to the protection and physical, mental, and moral welfare of the child," the hearing court must take into account "any and all factors which bear upon the child's welfare and which can aid the court's necessarily imprecise prediction about that child's future well-being." *In re Davis*, 465 A.2d 614, 620 (Pa. 1983).

The purpose of the Juvenile Act is to preserve family unity and to provide for the care, protection, safety and wholesome mental and physical development of the child. 42 Pa.C.S.A. 6301(a)(1)-(1.1). The Juvenile Act was not intended to place children in a more perfect home; instead, the Act gives a court the authority to "intervene to ensure that parents meet certain legislatively determined irreducible minimum standards in executing their parental rights." *In re J.W.*, 578 A.2d 952, 958 (Pa. Super. 1990).

When a child is placed in foster care, the parents have an affirmative duty to make the changes in their lives that would allow them to become appropriate parents. *In re Diaz*, 669 A.2d 372, 377 (Pa. Super. 1995). A family service plan is created to help give the parents some guidelines as to the various areas that need to be improved. *In the Interest of M.B.*, 565 A.2d 804, 806 (Pa. Super. 1989), [*appeal denied*], 589 A.2d 692 (Pa. 1990). By assessing the parents' compliance and success with this family service plan, the [c]ourt can determine if the parents have fulfilled their affirmative duty. *In re J.S.W.*, 651 A.2d 167, 170 (Pa. Super. 1994).

Under [s]ection 6351 of the Adoption Act, the Agency has the burden to show a goal change would serve the child's best interests and the "safety, permanency, and well-being of the child must take precedence over all other considerations." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009), [*appeal denied*], 973 A.2d 1007 (Pa. 2009). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

In the present matter, the Agency has proven by clear and convincing evidence that it is in the minor child's best interest to

change the goal to placement for adoption. The minor child has been in placement for approximately [22] months and adjudicated dependent for approximately [20] months. The minor child needs a permanent, safe and stable environment.

Since the adjudication of dependency, Mother has made minimal progress towards alleviating the circumstances which necessitated the minor child's placement. Mother made no progress related to her parenting skills with the Catholic Charities team and the team closed out unsuccessfully. Mother has made attempts for visitation with the minor child since the adjudication of dependency; however, Mother has never progressed to unsupervised visits with the minor child due to her mental health issues.

Mother received a Parenting Capacity Assessment by Dr. Jonathan Gransee on January 12, 2017 to assess her mental health and to determine her capacity to parent the minor child. Mother was given IQ testing and was determined to have learning issues. Her IQ score of 58 qualifies her for a diagnosis of Intellectual Disability, Mild. The psychologist was informed by Mother's caseworker that Mother does not have any interactions with the minor child during their visits; rather, Mother and the minor child do not talk and Mother "just kinda stares off." Dr. Gransee stated in the Parenting Capacity Assessment that, ". . . at this point, it appears she [Mother] does not possess sufficient capacity to parent her child."

Additionally, Mother's Pressley Ridge in-home family therapist testified that she has concerns related to Mother's mental health issues. She testified that safety issues could arise if Mother and minor child were left alone unsupervised. The family therapist did testify that the bond between Mother and minor child appears strong and that termination would negatively impact the minor child similar to how termination of any extended family member would negatively impact a child. The issue remains that the minor child has been adjudicated dependent for approximately [20] months and Mother has yet to progress to unsupervised visits.

Since the adjudication of dependency, Father has made minimal progress towards alleviating the circumstances which necessitated the minor child's placement. Pressley Ridge opened services with Father on March 29, 2017 and remained open until November 13, 2017. Despite receiving services for approximately seven []

- 10 -

months, Father was never able to progress to unsupervised visits with the minor child. Father had requested to increase supervised visits with the minor child from one to two times a week; however, Pressley Ridge remained concerned about Father's ability to provide a safe environment for the minor child. The Pressley Ridge in-home family therapist testified that, although all of Father's actions and boundaries with the minor child have been appropriate during their visits, she never felt comfortable leaving the minor child alone with Father.

Furthermore, Father received a Psycho-Sexual Assessment which the [trial court] finds seriously concerning as it relates to Father's views of appropriate sexual conduct. When asked to rate the statement[,] "A lot of times, sexual assaults on children are not planned. . . they just happen," Father said he agreed with that statement. When asked to rate the statement "Most women are sluts and get what they deserve. . . ," Father said he strongly agreed with that statement. When asked to rate the statement "If a young child stares at my genitals it means the child likes what she sees and is enjoying watching my genitals. . .," Father neither agreed nor disagreed with that statement. Father had previously stated that Maternal Grandmother was "fine" with Father having sex with his step-daughter, Maternal Grandmother's [d]aughter and mother of the minor child subject to this matter. Father also indicated to the [Agency] Caseworker about one [] week prior to the [h]earing on the Agency's [p]etition that he did not understand why it is inappropriate for him to have had sex with his step-daughter, adult or not. Father also acknowledged his inability to control his sexual urges as it relates to Mother and stated that he spends a good majority of his time at the house in his room alone to control his urges. This testimony raises questions of appropriate sexual boundaries between Mother, Father and Maternal Grandmother, who all live in the same household.

The [trial court found] that Father lied about how many times he had sexual encounters with Mother. Father originally stated he [] never had sex with Mother. After paternity was established, Father stated he only had sex with Mother one [] time. During Father's Psycho-Sexual Assessment, he stated [] he had sex with Mother four [] times. The [trial court found] that Father lacks credibility due to his inability to tell the truth regarding his sexual contact with Mother.

- 11 -

Furthermore, Father minimized his responsibility regarding his sexual contact with his step-daughter, Mother of the minor child. Although it is not legally incest, Father raised step-daughter since she was four [] years old. The [trial court voiced] concerns about Father's ability to safely protect the minor child given the history Father has with his step-daughter, Mother of the minor child.

Testimony established that the minor child and Father have a bond and the minor child enjoys being with Father; however, testimony emphasized the fact that the minor child believes Father is his step-grandfather and remains unaware of the fact that Father is his biological father. The bond between minor child and Father is not a parental bond but rather a family relative kind of bond.

Overall, Mother and Father [] made minimal progress towards alleviating the circumstances which caused the minor child to be placed and have not assumed any major parental duties for minor child. The [trial court] remain[ed] extremely concerned about the lack of appropriate boundaries between Father, Mother and Maternal Grandmother. As such, the [trial court found] that the minor child's best interest demand[ed] that the goal be changed from reunification with a parent to placement for adoption.

* * *

**CONCLUSIONS OF LAW**

1. The current placement of [Child] continues to be necessary and appropriate. 42 Pa.C.S. §6351(f)(1).

2. Mother and Father have not been able to meet the goals set forth in the family service plans. 42 Pa.C.S. §6351(f)(2).

3. The circumstances which necessitated [Child's] original placement have not been alleviated. 42 Pa.C.S. §6351(f)(3).

4. The current goal for [Child] of reunification with a parent is no longer feasible and appropriate because Mother and Father have failed to meet the irreducible minimum requirements necessary to parent the child. 42 Pa.C.S. §6351(f)(4).

5. [Child's] best interests demand that the current goal of reunification with a parent be changed to placement for adoption.

- 12 -

Trial Court Opinion, 11/30/17, at 7-13, 20-21 (emphasis in original)

Here, competent evidence in the record supports the trial court's change of permanency goal for Child to adoption as best suited to the safety, protection and physical, mental and moral welfare of the child. *See* 42 Pa.C.S. § 6351.

Next, we review the sufficiency of the evidence to support the termination of Father's parental rights. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court

- 13 -

and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Although the trial court focused its discussion on section 2511(a)(1), (2), (5), (8), and (b), we will discuss only sections 2511(a)(1), (2), and (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section 2511(a)(1) and (2) provide, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988). Further, this Court has stated:

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court described the requisite inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A

- 16 -

parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], [our Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in and of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

The trial court explained its decision to terminate parental rights as follows:

## II. Petition for Involuntary Termination of Parental Rights

The Agency argues that Mother's and Father's parental rights to the minor child should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1) [and (2)] of the Adoption Act. The Agency has the burden of establishing by clear and convincing evidence that statutory grounds exist to justify the involuntary termination of parental rights. ***In re Child M.***, 681 A.2d 793, 797 (Pa. Super. 1996). The clear and convincing standard means that the evidence presented by the Agency is so "clear, direct, weighty, and convincing" that one can "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***Matter of Sylvester***, 555 A.2d 1202, 1202-1204 (Pa. 1989). The Agency must also present evidence proving that the termination of parental rights will serve the child's best interests. ***In the Matter of Adoption of Charles E.D.M. [ ]***, 708 A.2d 88, 92-93 (Pa. 1998). To determine whether termination is within the best interest of the child, the court must examine the possible effect the termination would have on the child's needs and general welfare. ***In re Adoption of Godzak***, 719 A.2d 365, 368 (Pa. Super. 1998).

**THE AGENCY HAS PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT PARENTAL RIGHTS TO THE MINOR CHILD MUST BE TERMINATED PURSUANT TO 23 Pa.C.S. §2511(a)(1)**

To terminate parental rights under 23 Pa.C.S. §2511(a)(1) of the Adoption Act, the Agency must establish, by clear and convincing evidence, that the parent has either demonstrated a settled purpose of relinquishing parental claim to a child or has failed to perform parental duties. ***In the Matter of Adoption of Charles E.D.M. [ ]***, 708 A.2d at 91. Once one (1) of the two (2) factors has been proven, the Court must examine the following three [] factors: (1) parent's explanation for the conduct; (2) post-abandonment contact between parent and child; and (3) effect of termination on child. ***Id.***

- 19 -

The Agency has proven by clear and convincing evidence that Mother and Father have failed to perform any significant parental duties for the minor child. The minor child has been dependent for approximately [20] months. Testimony established that Mother made no progress regarding her parenting skills during the time minor child has been dependent and failed to successfully complete services with Catholic Charities.

Testimony [also] established that[,] although supervised visits between Mother and minor child occurred, there is a continuing safety concern regarding Mother's mental health issues and her ability to properly parent the child. As such, the Agency testified that the minor child does not have a parental bond with Mother but rather an extended family member type of bond. Further, Mother failed to progress to unsupervised visits with the minor child since the child was taken into care in March 2016.

In the [20] months that minor child has been adjudicated dependent, Father has never progressed to unsupervised visits. There is a continuing concern regarding Father's ability to understand appropriate sexual boundaries given his history with his stepdaughter and untruthfulness surrounding his history with her. The Pressley Ridge in-home family therapist testified that she never felt comfortable leaving the minor child alone with Father and did not feel comfortable progressing to unsupervised visits at the time of the [h]earing on the Agency's Petition for termination of parental rights.

Before entering foster care, the minor child showed significant dental neglect. Mother and Father neglected taking minor child to the appropriate dental appointments for many years and, as a result, the minor child suffered significant pain over a two (2) year period. Additionally, the minor child was not properly potty-trained and could not appropriately feed himself with utensils when he came under the care of the Agency when he was six (6) years old. Since residing with foster parents, the minor child has learned how to care for his hygiene independently and has had his dental issues managed.

Academically, the minor child has shown improvement under the foster parents' care. The minor child receives instructional support in a neurological support classroom within the Dallastown Area School District. He also receives speech services both in and out of the school. When the minor child came into the foster

parents' care, he displayed a [k]indergarten/beginning [f]irst [g]rade level when he started [s]econd [g]rade. Currently under the foster parents' care, his instructional support educator testified that he has shown significant improvement and now displays a mid-[f]irst [g]rade level in reading, a [f]irst [g]rade level in math, and a beginning [f]irst [g]rade level in writing. His teacher testified that neither Mother nor Father were involved in the updating of the child's IEP in February 2017. Mother has never attended any of minor child's school activities and has never contacted the school regarding the minor child's IEP. Father, on the prompting of the caseworker, contacted the school one [] time [] to request information related to the minor child's IEP plan.

Overall, the [trial court] finds that the termination of Mother's and Father's parental rights will provide a benefit to the minor child in that the child will achieve stability and permanency in a loving and safe home. Therefore, for all the reasons stated above, the Agency has proven by clear and convincing evidence that termination of parental rights to the minor child is justified pursuant to Section 2511(a)(1) of the Adoption Act.

**THE AGENCY HAS PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT PARENTAL RIGHTS TO THE MINOR CHILD MUST BE TERMINATED PURSUANT TO 23 Pa.C.S. § 2511(a)(2)[.]**

The Agency has also proven by clear and convincing evidence that the parental rights to the minor child should be terminated pursuant to 23 Pa.C.S. § 2511(a)(2) [] of the Adoption Act. The mandates of these sections are as follows:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well[-]being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

The [trial court found] that the conditions which led the minor child to placement outside the care and custody of Mother and Father continue to exist. The minor child has been in placement for approximately [20] months and is well-bonded to the foster family. The minor child has a bond with Mother but it is not a

- 21 -

parent-child bond; rather, the minor child sees Mother as an extended family member. While the minor child has a bond with Father, minor child believes Father is actually his step-grandfather and does not look to Father as a parent nor does he address Father as "Dad."

The [trial court] remains concerned with Mother's and Father's ability to parent and care for the minor child. Testimony established that Mother currently does not have employment nor does she have any previous working experience. Mother has received disability since the time she was [18] years old due to her mental health diagnoses. Father also receives disability and does not work. Mother and Father currently reside in the same house, along with Father's wife who is also the mother of minor child's [m]other. The [trial court was] troubled by the inappropriate boundaries between these three [] adults.

Overall, Mother and Father have failed to remediate the conditions which led to the minor child's placement and have failed to provide parental duties on behalf of the minor child. Mother and Father have been unable to progress to unsupervised visits with the minor child since the adjudication of dependency approximately [20] months ago. In consideration of this testimony, the [trial court found] that the Agency clearly and convincingly established that termination of parental rights is justified pursuant to [s]ection 2511(a)(2)[] of the Adoption Act.

**IN CONSIDERATION OF §2511(b), TERMINATION OF PARENTAL RIGHTS WOULD BEST SERVE THE NEEDS AND WELFARE OF THE MINOR CHILD**

Having established the statutory grounds for the involuntary termination of the parental rights of Mother and Father, the [trial court's] final consideration is whether termination of parental rights will best serve the developmental, physical and emotional needs and welfare of the child. 23 Pa.C.S. §2511(b).

> [T]he Court must carefully consider the tangible dimension, as well as the intangible dimension - the love, comfort, security, and closeness - entailed in a parent – child relationship. (citations omitted). The court must consider whether a bond exists between the child and [parents], and whether termination would destroy an

existing beneficial relationship. ***In re: B.N.M.***, 856 A.2d 847 (Pa. Super. 2004).

The [trial court] thoroughly evaluated the minor child's relationships in this matter. [It found] that the minor child has a bond with Mother but it is not of a parent-child nature. The [trial court further found] that the minor child has a bond with Father; however, the minor child believes Father is his step-grandfather, not his biological father. The [trial court found] that the minor child has a much stronger parental bond with the foster family and that the minor child looks to the foster parents for comfort. It is the foster family who provides for the minor child's daily needs and acts as the minor child's parental figures. Testimony established that the minor child calls the foster parents "mom" and "dad." At this point, the [trial court therefore concluded] that the termination of Mother's and Father's parental rights will not have a significantly negative impact on the minor child.

The [trial court] also finds that the bond between the minor child and foster family is strong and healthy. Testimony established that the child is thriving and improving both health-wise and academically in the foster family's care. Before entering foster care, the minor child showed significant dental neglect. Mother and Father neglected taking minor child to the appropriate dental appointments for many years and, as a result, the minor child suffered significant pain over a two[-]year period. Additionally, the minor child was not properly potty-trained and could not appropriately feed himself with utensils when he came under the care of the Agency when he was six [] years old. Since residing with foster parents, the minor child has learned how to care for his hygiene independently and has had his dental issues managed.

Academically, the minor child has shown improvement under the foster parents' care. The minor child receives instructional support in a neurological support classroom within the Dallastown Area School District. He also receives speech services both in and out of the school. When the minor child came into the foster parents' care, he displayed a [k]indergarten/beginning [f]irst [g]rade level when he started [s]econd [g]rade. Currently under the foster parents' care, his instructional support educator testified that he has shown significant improvement and now displays a mid-[f]irst [g]rade level in reading, a [f]irst [g]rade level in math, and a beginning [f]irst [g]rade level in writing. His teacher testified that neither Mother nor Father were involved in

the updating of [C]hild's IEP in February 2017. Mother has never attended any of minor child's school activities and has never contacted the school regarding the minor child's IEP. Father, on the prompting of the caseworker, contacted the school one [] time [] to request information related to the minor child's IEP plan. Conversely, foster parents attend every conference that is scheduled for the minor child and are in constant communication with the minor child's teacher. The foster parents appear to be engaged and advancing the minor child's interests.

The bond that the minor child has with the foster family can provide safety, security and permanency for the child. Termination of parental rights will best meet the needs of the minor child and permit the child to achieve the stability that he deserves.

\* \* \*

## CONCLUSIONS OF LAW

\* \* \*

[] Mother and Father have failed to perform parental duties for a period well in excess of six (6) months. 23 Pa.C.S. §2511(a)(1). [In addition, t]he Agency has established by clear and convincing evidence that the inability and refusal of Mother and Father has caused the child to be without parental care, control or subsistence necessary for [his] physical or mental well-being and the conditions cannot be remedied by Mother and Father. 23 Pa.C.S. §2511(a)(2).

\* \* \*

## SUMMARY

In conclusion, the [trial court determined] that the termination of Mother's and Father's parental rights is clearly in the best interests of the minor child to promote his welfare and allow him to achieve permanency. The [trial court] therefore execut[ed] a [d]ecree terminating Mother's and Father's parental rights with respect to [Child,] and an [o]rder directing that the current goal of reunification with parent or guardian for [Child be] changed to placement for adoption. Said [o]rder also establishes the concurrent goal for [Child] to be placed with a legal custodian (non-relative).

Trial Court Opinion, 11/30/17 at 13-22 (emphasis in original).

Regarding section 2511(a)(1), the competent evidence in the record supports the trial court's finding that Father failed to perform parental duties. Moreover, the trial court rejected Father's explanation for his conduct toward Child, considered the post-abandonment contact between Father and Child, and also considered the effect of terminating Father's parental rights on Child under section 2511(b). *See In re Adoption of Charles E.D.M.*, 708 A.2d at 92. With respect to section 2511(a)(2), the record also supports the trial court's conclusion that Father's repeated and continued incapacity, abuse, neglect or refusal caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being, and that the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Father. Thus, we find no abuse of discretion or error of law on the part of the trial court. *See In re Adoption of S.P.*, 47 A.3d at 826-27. Because we find no abuse of the trial court's discretion, we affirm the court's decree and order.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/25/18

- 25 -