J-A02010-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 982 WDA 2024 |

Appeal from the Order Entered July 16, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000217-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 983 WDA 2024 |

Appeal from the Order Entered July 16, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000218-2023

BEFORE: KUNSELMAN, J., MURRAY, J., and BECK, J.

MEMORANDUM BY KUNSELMAN, J.:　　　　　**FILED: March 14, 2025**

In this consolidated matter, B.B. (Mother) appeals from the orders granting the petitions filed by the Allegheny County Office of Children, Youth and Families (the Agency) which terminated her rights to her then fourteen-year-old son, D.T., and her then five-year-old daughter, D.L., (collectively,

the Children), pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), (b). After review, we affirm.[1]

We discern the following factual background from the orphans' court's Appellate Rule 1925(a) opinion and the termination hearing transcripts.[2] The Agency has a history of involvement with this family dating back to 2011. Between 2011 and 2021, the Agency received multiple referrals involving the Children's older half-sibling.[3] At least two of the referrals also involved D.T. The present case began in January 2022 when Mother left the Children and sibling home alone for approximately a week, and they ran out of food. The Agency obtained an emergency custody authorization and removed the Children from Mother's care. The Children were adjudicated dependent in February 2022. The Children had several different placements, before being

---

[1] The court also involuntarily terminated the rights of the Children's respective fathers, who did not appeal.

[2] We note that the certified record on appeal does not include the exhibits that were admitted into evidence at the termination hearing, except for the parties' stipulations. However, the record includes the hearing transcripts. Mother relies on the testimony from the termination hearing to support her arguments. Thus, our appellate review was not impeded. Nonetheless, we remind Mother and her counsel that it is ultimately the appellant's responsibility to ensure that the record is complete on appeal to enable our appellate review. *See* Pa.R.A.P. 1921, Note.

[3] We clarify that the Children's sibling was not involved in this appeal. The record is unclear as to the sibling's age and current placement, but it appears that the sibling may no longer be a minor. The sibling is not in Mother's care.

placed with Foster Mother in December 2022, where they have since remained.

Mother was criminally charged with endangering the welfare of children for the events leading to the Children's removal and was incarcerated at the time of the Children's adjudication. She was sentenced to two years of probation. While out on bail, in February 2022, Mother kidnapped D.L. from maternal grandmother's house. Mother then faced additional criminal charges and was sentenced to one hundred twenty-seven days of confinement and twelve months of probation. Mother was incarcerated from approximately February 2022 to July 2022. A week after being released, Mother entered Western Psychiatric Institute and Clinic for a mental health evaluation and stabilization; she remained there for approximately two weeks.

In April 2023, Mother was charged with several crimes, including arson, for setting a fire in her house. She was incarcerated from April 2023 to December 2023. She entered Mental Health Court in January 2024. As part of Mental Health court, Mother is required to, among other things, attend mental health treatment, take her medication, and comply with probation.

Throughout the case, Mother's goals included signing releases of information, having a mental health evaluation and following all recommendations, complying with her mental health medication, having supervised visitation with the Children, attending parenting classes, addressing and resolving her criminal charges, and complying with her probation requirements.

Although Mother signed releases of information, Mother did not sustain continuous progress on many of her other goals. Mother has been diagnosed with bipolar disorder. Throughout the life of the case, there were times when Mother acknowledged to the Agency caseworker that she was not taking her mental health medication. During the times when Mother was unmedicated, she was often criminally charged for various offenses.

Mother attended visits with D.L. but never progressed to unsupervised visitation. Although D.T. attended the first visit with Mother, when Mother did not show up, D.T. chose not to attend any further visits.

The Agency referred Mother to Arsenal Family and Children's Center (Arsenal) for parenting classes. Mother attended seven out of eight scheduled sessions from March to April 2023, before being reincarcerated. Mother needed to complete at least twelve sessions to successfully finish the program. Additionally, Mother's behavior was problematic at two of the sessions, and Mother left another session an hour and fifteen minutes early. While incarcerated, Mother received parenting education, but not an interactive parenting class, as that was not offered.

The Agency filed petitions to terminate Mother's parental rights to the Children on October 24, 2023. The orphans' court held a two-day termination hearing on April 8 and April 22, 2024. The court heard testimony from a program coordinator at Arsenal, a foster care worker at Wesley Family Services, Mother's probation officer, two Agency caseworkers, Dr. Beth Bliss, and Mother. The court ultimately terminated Mother's rights under the

Adoption Act. 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), (b). Mother timely filed this appeal.[4] She presents the following two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hild[ren] pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief at 8.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[4] Although the orphans' court's orders terminating Mother's parental rights to the Children were dated April 22, 2024, they were inexplicably not docketed until July 16, 2024. Mother timely filed amended appeals from both orders. This Court consolidated the appeals *sua sponte* on August 30, 2024.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports the trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267.

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted);

*see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Mother's rights under Section 2511(a)(2), (a)(5), (a)(8), and (b). As we may affirm under any ground under Section 2511(a), we review the court's decision as to Section 2511(a)(2). That subsection provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

[. . .]

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the

- 7 -

incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Moreover, grounds for termination under Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Here, the orphans' court determined that the Agency met its burden. The court noted:

> In this case, the overarching theme is that Mother lacks the stability necessary to provide for her [C]hildren. Mother either cannot or will not attain such stability in a reasonable period of time. This inability to provide proper parental care and control dates back to 2011, and is reflected by an extensive and consistent history of [Agency] involvement in the lives of the [f]amily members. Mother's history with the Agency has consistently shown that she lacks the ability to appropriately supervise her [C]hildren. . . .
>
> Since removal in connection with the most recent referral, the Children have never returned to Mother's care. Throughout the life of the case, Mother has been repeatedly incarcerated, and has been hospitalized for her mental health needs. Despite periods of stability, Mother's longest period of compliance with her medication and treatment has been 3 months. When she is non-compliant, she is unstable and unfit to parent her [C]hildren.
>
> [. . .]
>
> As to Section 2511(a)(2), Mother has repeatedly and consistently lacked the capacity to provide proper and essential parental care and control for her Children's

wellbeing. Her history demonstrates that she cannot or will not remedy this incapacity.

Orphans' Court Opinion (O.C.O.), 9/24/24, at 17-19.

On appeal, Mother argues that there was insufficient evidence to support a determination that "there was a continued incapacity of Mother to provide essential parental care for [the Children]" and that "the conditions that led to the removal of [the Children] from the care of Mother have not or cannot be remedied." Mother's Brief at 23. Mother asserts that the orphans' court abused its discretion in finding that she did not complete her court-ordered goals or would not be able to complete the goals within a reasonable time. *See id.* at 24. Mother claims she has remedied the conditions that led to the Children's removal "by taking part in ongoing mental health treatment and taking her prescribed medications." *Id.* Mother argues that she participated in the Arsenal parenting program and would have finished it if she had not been incarcerated. *Id.* While incarcerated, she participated in two parenting education programs. *Id.* Mother is currently compliant with her probation. *Id.* at 25. Mother asserts that she is in a much better place now, and the evidence clearly shows she can provide essential parental care. *Id.*

Mother's argument fails to appreciate the standard of review we must apply to termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M.*, 71 A.3d at 267 (citation omitted). This is true even if the record could support an opposite result. *See id.*

- 9 -

Our review of the record supports the orphans' court's decision. The Agency caseworker testified that Mother did not successfully complete, make sustained progress on, or substantially comply with her court-ordered goals. N.T., 4/8/24, at 83. Mother would make some progress on her goals, but her progress would be interrupted by incarceration on new charges. *Id.* The caseworker indicated that when Mother is on her medication, she has periods of time where she is stable and compliant with services. *See id.* at 83-84. However, when Mother stops her medication, there is a slow decline in Mother's mental health. *See id.* at 84. Mother never had more than moderate compliance and progress with the permanency plan and with alleviating the circumstances that caused the Children's removal. *See id.* Sometimes Mother had no or minimal compliance and progress. *See id.* at 84-85.

As noted, the Children were removed in January 2022 because Mother left them home alone for approximately a week, potentially longer, and they ran out of food. At the termination hearing, over two years after removal, Mother's testimony indicated that she still believed she had not done anything wrong by leaving the Children alone. *See* N.T., 4/22/24, at 60. Specifically, Mother disputed that she was gone for a week, instead saying it was for four days, and she checked on the Children multiple times throughout the day. *Id.* at 50. Mother indicated that leaving the Children and their sibling alone for the weekend was reasonable because "they're mature kids and they didn't have a problem." *Id.* at 51. Mother seemed to believe the only problem was

that they were left alone for longer than a weekend. She attempted to excuse her behavior by saying she was snowed in and not feeling well. *See id.* at 50-51, 60. Mother said she "wanted [the Children and sibling] to have a fun weekend without [her]" so they could "get some experience and let [her] know what they did and did not know without [her]" and that she "gave them a time away from [her] where they could do whatever they wanted to do." *Id.* at 50. Mother stated that the Children's sibling was sixteen years old at the time, D.T. was twelve, and D.L. was three. *Id.* at 50-51.

Similarly, Dr. Bliss, who performed individual and interactional evaluations of Mother, the Children, and Foster Mother, testified that Mother did not understand or take responsibility for the reasons the Children were in foster care, and did not understand why the Children have remained out of her care. *See id.* at 10-12, 16. Mother told Dr. Bliss that the Agency became involved when the Children's older sibling lied about Mother leaving them alone for a week without any food. *Id.* at 11-12.

The Agency identified that the primary concern in this case was Mother's mental health instability. *See* N.T., 4/8/24, at 80. Mother's progress in remedying this concern was inconsistent, and, after over two years, she never reached the point where the Children could be returned to her care. In fact, Mother never progressed to unsupervised visits. *Id.* at 67-68.

Prior to the Agency filing its termination petition, Mother's longest period of sustained compliance with mental health treatment was three months. *See*

*id.* at 107-08. She had a history of being inconsistent with her medication. *See* N.T., 4/22/24, at 15-16. In March or April 2023, over a year after the Children's removal, Mother reported to the Agency caseworker that she felt medical marijuana was alleviating her symptoms, and she no longer needed other medication and felt fine without it. N.T., 4/8/24, at 79-81. Shortly thereafter, when Mother was reincarcerated, she acknowledged to the caseworker that she should go back on her medication. *See id.* at 79-80.

In January 2024, three months before the termination hearing, Mother indicated to her probation officer that she had recently either stopped taking her medication or was lowering her dose of medication due to side effects, without the approval of her providing doctor. *See id.* at 44-45; *see also* N.T., 4/22/24, at 46.

During Dr. Bliss's evaluation of Mother in February 2024, two months before the termination hearing, Mother stated that she did not see a benefit from her medication. *See* N.T., 4/22/24, at 15. Although Mother testified at the hearing that she was in mental health treatment and taking her medication at that time, she admitted that she did not think her medication was helping her or making her feel any different. *See id.* at 38-40, 46, 56-58.

Mother approached the tests with Dr. Bliss in a very guarded manner, attempted to present herself in an overly positive light, and was unwilling to admit to even minor problems in her life. *See id.* at 16-17. Dr. Bliss's expert opinion was that Mother was not currently in a position to care for the Children

and reunification would not be imminent. ***See id.*** at 25-26. The Agency also believed that reunification would not be imminent. ***See*** N.T., 4/8/24, at 93.

Additionally, Mother did not successfully complete the Arsenal parenting program. ***Id.*** at 10. Mother asserts that she would have completed the program if she had not been incarcerated. Mother's Brief at 24. Mother testified that she was waiting for information from the Agency caseworker on how to reengage with Arsenal. ***See*** N.T., 4/22/24, at 35. However, Mother was released from incarceration in December 2023, but she had not completed the program by the time of the hearing in April 2024. ***See id.*** Mother also exhibited problematic behavior during two of the visits at Arsenal, including becoming confrontational with staff and another child in the room. ***See*** N.T., 4/8/24, at 10-14. Mother did not want to listen to feedback from those visits. ***Id.*** at 18. Mother left another visit an hour and fifteen minutes early. ***Id.*** at 14. Further, Mother testified that she "didn't really learn much" during the Arsenal program because it was not educational. N.T., 4/22/24, at 35.

Therefore, competent evidence supported the court's determination that Mother's continued incapacity caused the Children to be without essential parental care and that Mother cannot or will not remedy the causes of her incapacity. Contrary to Mother's claims, the record reflects that Mother is not able to make "reasonably prompt assumption of full parental duties." ***A.H.***, 247 A.3d at 443 (citation omitted). Because the orphans' court's findings are

supported by the record, we must accept them. *See T.S.M., supra*. Mother's first issue merits no relief.[5]

We turn next to Mother's second issue which challenges the orphans' court's findings under Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child).

---

[5] We need not address Mother's argument regarding Section 2511(a)(5) and (a)(8) because we may affirm termination of her rights under any ground under Section 2511(a).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *K.T.*, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *Id.* at 1106 (citing *T.S.M.*, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. *Id.* (citing *T.S.M.*, 71 A.3d at 268; *In re D.C.D.*, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's rights served the Children's needs and welfare. The court determined:

> [Mother] is, most importantly, incapable of fulfilling the [C]hildren's most basic developmental, physical and emotional needs. Severing the [C]hildren's unhealthy bonds with her will result in no lasting harm. The bonds with Mother are not necessary or beneficial to the Children and maintaining them does not serve the Children's needs.
>
> In contrast, the Children have positive, appropriate, and secure attachments with Foster Mother. The Children are in a pre[-]adoptive home and have bonded with the entire family. They were comfortable and engaged during their interactional evaluation with Foster Mother, and they share a beneficial and necessary bond. . . .
>
> The [f]oster home serves all of [the Children's] developmental, physical, and emotional needs.

O.C.O. at 22-23.

- 15 -

On appeal, Mother first claims the court should never have reached the question under Section 2511(b) because the Agency did not meet its burden under Section 2511(a). *See* Mother's Brief at 27. We disagree as discussed above.

Mother further contends that the court erred as a matter of law by concluding that termination met the Children's needs and welfare. *See id.* Most of Mother's argument here specifically relates to D.L. Mother cites the testimony of witnesses at the termination hearing who stated that Mother was very consistent in visiting D.L., D.L. enjoyed seeing her, she cared for D.L.'s physical needs, Mother and D.L. bonded and showed affection with one another, and D.L. stated she missed Mother and wanted to come home. *See id.* Dr. Bliss observed D.L. being comfortable sitting on Mother's lap, and D.L. wanted her "two mommies" to live together with her. *See id.* at 27-28. Further, Mother argues that she loves the Children and "has much to offer for their benefit." *Id.* at 28. Mother asserts that their relationship adds value to their lives, and termination would "unnecessarily and permanently deprive" the Children of this relationship which is not best for their needs and welfare. *Id.*

Mother's argument again fails to appreciate the standard of review we must apply in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record, even if the record could support an opposite result. *See T.S.M.*, 71 A.3d at 267 (citations omitted).

Here, the record supports the orphans' court's findings. As of the termination hearing, Mother had not visited with D.T. since his removal in January 2022. *See* N.T., 4/22/24, at 55. D.T. attended the first visit, but when Mother did not show up, D.T. refused to attend future visits. *See* N.T., 4/8/24, at 61. D.T. told multiple people that he wanted to remain in foster care and be adopted by Foster Mother. *See id.* at 91-92, 116; *see also* N.T., 4/22/24, at 9. During their interactional evaluation, Mother extensively questioned D.T. about why he did not want to come back, why he was not visiting her, if he missed her, and if he wanted to talk to her; D.T. appeared extremely uncomfortable during this conversation. *See* N.T., 4/22/24, at 18-20. Dr. Bliss stated that D.T. had an avoidant attachment to Mother. *See id.* at 24. D.T. also disclosed to Dr. Bliss that the Children's older sibling often raised him and D.L., and there were times when he was emotionally and physically abused by Mother. *See id.* at 8.

Mother told D.T. that she intended to reunify with D.L. regardless of what D.T. planned to do, indicating the possibility of Mother separating the Children. *See id.* at 19. Dr. Bliss and the Agency caseworker testified that the Children are very bonded to each other and separating them would be harmful. *Id.* at 28; *see also* N.T., 4/8/24, at 92.

Regarding D.L., Mother is correct that witnesses at the termination hearing testified to positive interactions and a bond between D.L. and Mother. For example, the foster care worker testified that D.L. was happy to see Mother during virtual visits and stated that she missed Mother. N.T., 4/8/24,

at 33-34. The program coordinator at Arsenal testified similarly: that D.L. was happy to see Mother, said she missed Mother, was sad when visits were ending, and told Mother once that she wanted to come home with Mother. *See id.* at 16-17. Although not cited by Mother, we observe that one caseworker testified that D.L. said she wished she could be with Mother, but that if she could not, she would want to be adopted by Foster Mother. *Id.* at 115-16.

However, Mother fails to acknowledge the competing testimony. We note that the Arsenal visits occurred approximately a year before the termination hearing was held. Dr. Bliss, who conducted her evaluations more recently, testified that D.L. had an ambivalent attachment and bond to Mother. N.T., 4/22/24, at 23-24, 29. D.L. was comfortable enough to sit on Mother's lap and engage with her but was just as comfortable, content, and happy to play independently. *Id.* at 24, 29. D.L. expressed to Dr. Bliss that she had "two mommies" and wished she could live with them both. *Id.* at 22, 24-25, 29. D.L. expressed a similar sentiment to one of the caseworkers. N.T., 4/8/24, at 92. In Dr. Bliss's opinion, because D.L. has had limited contact with Mother for years and is very young, it would not be traumatic or harmful to sever her bond with Mother. *See* N.T., 4/22/24, at 29. Further, the stability, safety, and security from Foster Mother could ameliorate any discomfort from severing D.L.'s bond with Mother. *Id.*

The Children's counsel represented that she had a conversation with D.L. regarding the termination proceeding and what it would mean to be

adopted.[6] *Id.* at 68. D.L.'s understanding was limited due to her age and development, but she was able to express an understanding to some degree and a desire to remain in her foster home. *See id.*

Additionally, other testimony at the hearing reflected that the Children are bonded to Foster Mother, have a positive and secure attachment to her, call her "mom," and view her as their psychological parent. *See* N.T., 4/8/24, at 32; *see also* N.T., 4/22/24, at 13, 24-25. The Children are also bonded to other children in the foster home. *See* N.T., 4/8/24, at 31-32. Foster Mother is a pre-adoptive resource for the Children, serves as their educational and medical decision maker, and meets all of their needs. *Id.* at 25, 38. During Dr. Bliss's interactional evaluation with the Children and Foster Mother, the whole family was very comfortable with one another. N.T., 4/22/24, at 13. Conversely, although Mother appeared happy to see the Children during their interactional evaluation, the Children "didn't initially react much" to seeing her. *See id.* at 18.

Overall, we reiterate that it was the orphans' court's job to make factual findings and credibility determinations from the evidence presented. *See*

---

[6] We discern from the record that KidsVoice served as the Children's guardian *ad litem* during the dependency proceedings. On December 14, 2023, the orphans' court issued orders appointing KidsVoice to serve as legal counsel for the Children during the termination proceeding. The orders stated, "the court finds that no conflict exists that would prevent KidsVoice from accepting this appointment." Orders Appointing Legal Counsel for a Child in a TPR Proceeding, 12/14/23, at 1 (unnumbered). At the beginning of the termination hearing, the Children's counsel indicated that there was no conflict between the Children's best and legal interests, and the court accepted that determination. *See* N.T., 4/8/24, at 5-6.

***T.S.M., supra***.  Because the record supports the orphans' court's findings, we must accept them.  ***See id.***  Mother's second issue merits no relief.

In sum, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Mother's parental rights under Section 2511(a)(2) and (b) of the Adoption Act.

Orders affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 3/14/2025