J-S03003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 947 WDA 2024 |

Appeal from the Order Entered July 22, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000021-2024

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY KUNSELMAN, J.:            **FILED: March 18, 2025**

H.B. (Mother) appeals from the order granting the petition filed by the Allegheny County Office of Children, Youth and Families (the Agency) which terminated her rights to her now six-year-old son, H.B. (the Child), pursuant to the Adoption Act.  **See** 23 Pa.C.S.A. § 2511(a)(2), (a)(8), (b).  After review, we affirm.[1]

In its Appellate Rule 1925(a) opinion, the orphans' court set forth the following factual history:[2]

---

[1] The court also involuntarily terminated the rights of A.W. (Father), who did not appeal.

[2] We note that the certified record on appeal does not include the exhibits that were admitted into evidence at the termination hearing.  Mother relies on the testimony from the termination hearing to support her arguments.  Thus, our appellate review was not impeded by not having the exhibits in the certified record.  However, we also note with displeasure that the certified record
*(Footnote Continued Next Page)*

The [Agency] first became aware of Mother and [the] Child at the end of February 2022. On March 1, 2022, [the Agency] received a report raising concerns regarding Mother's mental health status as well as that [the] Child was exhibiting extremely challenging behaviors. The [Agency] caseworker responded to Children's Hospital and observed Mother to have disorganized thoughts, rapid speech, and a "very difficult time maintaining her emotional stability when interacting with [the] [C]hild." Mother's conduct that day "included statements that she might hurt herself or [the] Child, that she has a lot of enemies and needed to go 'incognito,' and that [the] Child was 'possessed.[']" The caseworker also observed [the] Child's behavior which included[] hitting, kicking, spitting, punching, and head-butting. After speaking with Mother and observing her demeanor as well as [the] Child's behavior, [the Agency] obtained an Emergency Custody Authorization. Upon removal, [the] Child was placed in the foster home of Foster Mother.[FN 10]

> [FN 10] [The] Child was initially placed with Foster Mother for [a short time] before being placed in kinship care. [The] Child remained in the kinship placement for only a short time before needing to be removed due to difficulty in managing his behaviors. It was then determined that [the] Child would benefit from being placed in a therapeutic foster home. [The Agency] was able to locate an appropriate therapeutic placement. However, this only lasted for a few weeks, again due to difficulties with [the] Child's behavior. Around that time, [Foster Mother] expressed her desire to the caseworker to become therapeutically certified and have [the] Child returned to her care. [The Agency] referred [Foster Mother] to Cayuga Centers for certification and by November of 2022, [the] Child

initially did not include the hearing transcript. This Court expended its own resources to procure the hearing transcript to enable appellate review. We remind Mother and her counsel that it is ultimately the appellant's responsibility to ensure that the record is complete on appeal. *See* Pa.R.A.P. 1921, Note.

was returned to her care where he has since remained.

[The] Child was adjudicated dependent on May 4, 2022, and the [c]ourt determined that placement remained necessary. The [c]ourt found the conditions requiring placement included Mother's need to participate in mental health treatment and demonstrate mental health stability, and her need to develop parenting skills necessary to manage [the] Child's behavior and to demonstrate use of those skills.

Since removal, [the] Child has not returned to Mother's care. Following a permanency review hearing on August 30, 2023, the [c]ourt suspended Mother's visits with [the] Child, concluding that visitation in any setting posed a grave threat to [the] Child due to Mother's mental health instability. Mother did not appeal this decision and has not visited [the] Child since May 5, 2023.

[The Agency] filed its petition to terminate Mother's parental rights on March 8, 2024, and a hearing was held on July 2, 2024. . . .[3]

The evidence at the hearing established Mother's ongoing incapacity and her inability to address the needs identified in the [c]ourt's orders or to remedy the conditions which brought [the] Child into care. Between [the] Child's adjudication and the time of filing of the termination petition, Mother made some initial progress in remedying both conditions that necessitated [the] Child's placement. Unfortunately, Mother was unable to maintain her mental health stability, and consequently, her parenting capacity deteriorated.

During the first year of [the] Child's placement, Mother participated in various services intended to assist her in

_____

[3] We note that Mother did not attend the hearing. Mother's counsel indicated that Mother intended to be present. The orphans' court attempted to reach Mother via phone. Although Mother was not present, her counsel represented her throughout the hearing. On appeal, Mother has not raised any due process concerns regarding her absence.

working toward reunification. At the time [the] Child came into care, Mother was receiving mental health therapy and medication management at Metro Community Health before transitioning these services to Mercy Behavioral Health in the fall of 2022. Mother disclosed a diagnosis of intermittent explosive disorder, and though she would not sign releases of information to disclose her prescribed medication, Mother informed the caseworker that it helped to keep her calm.

Following [the] Child's removal, Mother consistently attended visits with [the] Child, though they were generally challenging and chaotic with both Mother and [the] Child becoming upset. To assist with visitation, the [Agency] caseworker referred Mother and [the] Child to Cayuga Centers for therapeutic visitation in the fall of 2022. Mother initially attended the visits and by February 2023 she seemed to be doing well. The [Agency] caseworker observed Mother to demonstrate better reasoning skills and an increased ability to remain calm. By March, however, Mother had discontinued her mental health medication and, over the next few months, began to display paranoia, reporting that she believed the employees of Cayuga were possessed by demons.

As Mother's mental health continued to decline in the spring of 2023, she eventually stopped attending visits with [the] Child and periodically left the Pittsburgh area to travel to Atlanta, Georgia and Washington, D.C. During a permanency review hearing in August of 2023, the [c]ourt heard testimony regarding the extreme difficulty [the] Child experienced in adjusting to Mother's failure to visit. [The] Child is reportedly very schedule-oriented[,] and, for approximately six weeks, [the] Child regressed in his behavior while adjusting to his new routine. Based on this testimony, the [c]ourt determined that visitation under the current circumstances posed a grave threat to [the] Child and accordingly suspended Mother's visits. The [c]ourt ordered that Mother's visits could resume once she reengaged in mental health treatment.

Unfortunately, Mother failed to make any progress regarding her mental health for the duration of [the] case and continued to demonstrate paranoia and behavior that was more concerning than her behavior at the time of [the]

Child's removal. In the fall of 2023, Mother reported to her family support partner that there were men coming after her and that her earrings notified her when men were looking at her. More recent interactions with Mother demonstrate her continued mental health instability. In April 2024, Mother arrived at the Office of Behavioral Health indicating she needed assistance with housing and mental health. Mother met with . . . a mental health delegate, who offered to refer her to a variety of services to assist with Mother's needs. During this interaction, Mother was disorganized in her thought process and appeared to be responding to internal stimuli, having a conversation with someone or something that was not present in the room. In May 2024, . . . the permanency caseworker assigned to [the] Child's case, spoke with Mother over the phone. Mother spoke rapidly and [the Agency caseworker] found it difficult to follow her train of thought. During this conversation Mother reported that, while she was travelling in Atlanta, she died, was brought back to life, and was now blind and disabled.

Meanwhile, [the] Child has been in care for over two years and is doing extremely well in his pre[-]adoptive therapeutic foster home where all of his needs are being met. The [Agency] caseworker has observed [the] Child to interact very well with [Foster Mother]. [The] Child clearly recognizes [Foster Mother] as his primary caregiver and the person who ensures his safety and responds to his needs. [The] Child has become very bonded to [Foster Mother] and the other members of the family, engaging in activities with her husband and adult son and daughter. [Foster Mother] engages [the] Child in structured communication, informing him of upcoming plans to ensure he is not surprised. Regarding [the] Child's needs outside of the home and in school, the caseworker has observed [Foster Mother] to be an advocate for him during IEP meetings.

[The] Child appears to thrive with the structure and routine [Foster Mother] has created in the home. She spends a lot of time one on one with [the] Child completing schoolwork and working on his behavior. [The] Child has become better at expressing his emotions, communicating with others, is receptive to [Foster Mother's] redirection, and readily accepts consequences if he acts out. Based on the caseworker's observations, it would be a severe

detriment to [the] Child to be removed from [Foster Mother's] care as, historically, big changes caused a regression in his behaviors.

Orphans' Court Opinion (O.C.O.), 10/22/24, at 2-10 (record citations omitted).

Mother timely filed this appeal. She presents the following two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(2) and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hild pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief at 6.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports the trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267.

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted);

*see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Mother's rights under Section 2511(a)(2), (a)(8), and (b). As we may affirm under any ground under Section 2511(a), we review the court's decision as to Section 2511(a)(2). That subsection provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

[…]

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the

incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Moreover, grounds for termination under Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Here, the orphans' court determined that the Agency met its burden. The court noted:

> The evidence presented during the termination hearing established that, despite Mother's engagement with various services intended to assist her in addressing the causes of her incapacity, she has been unable to maintain the mental health stability necessary to appropriately parent [the] Child. While Mother initially demonstrated progress, including participating in mental health treatment and medication management, as well as therapeutic visitation with [the] Child, Mother was unable to sustain this progress. Approximately a year after [the] Child came into care, Mother discontinued her mental health medication and began exhibiting mental health symptoms similar to those observed by [the Agency] at the time of [the] Child's removal. Mother's decline in mental health stability necessarily affected her capacity to appropriately parent [the] Child. Mother's failure to make progress with her mental health resulted in the [c]ourt finding that visitation posed a grave threat to [the] Child.
>
> By the time of the termination hearing, approximately 11 months after visits were discontinued, Mother had not shown any progress in remedying her mental health instability. Indeed, and as discussed above, several witnesses' recent interactions with Mother continue to

reflect signs of ongoing psychosis. The evidence clearly established Mother's ongoing incapacity and the [c]ourt justifiably concluded that Mother cannot or will not remedy the problems that have made her incapable of functioning as [the] Child's full-time parent.

O.C.O. at 16-17.

On appeal, Mother argues that there was insufficient evidence to support a determination that "there was a continued incapacity of Mother to provide essential parental care for [the Child]" and that "the conditions that led to the removal of [the Child] from the care of Mother have not or cannot be remedied." Mother's Brief at 17. Mother asserts that the trial court abused its discretion in finding that she did not complete her court-ordered goals of participating in mental health treatment and medication management, undergoing a forensic evaluation,[4] and participating in therapeutic visitation with the Child. *Id.* Mother claims she has remedied the conditions that led to the Child's removal by participating in mental health treatment programs, therapeutic parenting classes, therapy sessions, medication management appointments, and sessions with Cayuga Center. *See id.* at 17-18. Mother argues that she has learned skills that help her communicate with the Child and improve their interactions. *See id.* at 18. Mother asserts that the

_____

[4] We observe that Mother participated in an individual psychological evaluation the week before the hearing, but the Agency did not have the report at the time of the hearing. *See* N.T., 7/2/24, at 72. However, according to the caseworker, the doctor who performed the evaluation indicated he would not recommend an interactional evaluation between Mother and the Child at that time. *See id.* at 111.

evidence clearly shows she can provide essential parental care to the Child. *Id.*

Mother's argument fails to appreciate the standard of review we must apply to termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record, even if the record could support an opposite result. *See T.S.M.*, 71 A.3d at 267 (citations omitted). Additionally, Mother's claims are belied by the record.

Our review of the record supports the orphans' court's decision. As noted, the Child was removed from Mother's care due to concerns with Mother's mental health stability and parenting skills. Although Mother initially made some progress towards remedying those concerns, Mother's progress stopped. Around April 2023, over a year after the Child was removed and approximately eleven months before the Agency filed its termination petition, Mother started exhibiting behavior that was similar to her behavior at the beginning of the case. *See* N.T., 7/2/24, at 48. Around May 2023, Mother told the caseworker that she was no longer in therapy and believed her medication was unnecessary. *See id.* at 55, 93. The caseworker indicated that Mother's behavior from May 2023 to the termination hearing in July 2024 was significantly more concerning than Mother's previous behavior. *Id.* at 58.

Mother last visited the Child on May 5, 2023, over a year before the termination hearing. *See id.* at 76, 140. At that time, the Child had already been removed from Mother's care for over a year, but Mother had not yet

progressed to fully unsupervised visits.  Additionally, Mother needed support from Cayuga Center during two partially unsupervised visits in April 2023. *See id.* at 147-48.  Mother also ended some visits early, stating that she was feeling overwhelmed.  *See id.* at 164-65.

The orphans' court suspended Mother's visits in August 2023 pending confirmation that Mother was engaged in appropriate mental health treatment.  *See id.* at 62.  However, the Agency never received adequate confirmation.  *See id.* at 63, 71-72, 77.  The Agency obtained information that Mother engaged in mental health services with Family Links in January 2024, but Mother only attended an intake and two sessions and was discharged for noncompliance in May 2024.  *Id.* at 64-65, 175-76.  On April 11, 2024, a county mental health delegate offered Mother referrals for mental health services, but Mother refused all services.  *See id.* at 23-24, 26-29.

Although Mother initially made progress with her therapeutic visitation and parenting program, she stopped participating in that service.  *Id.* at 72. Thus, the Agency still has concerns about her ability to parent the Child.  *Id.* at 72-73.  The Child has special needs, including an autism spectrum disorder diagnosis.  *Id.* at 73-75.   The Agency caseworker observed the Child having a hard time with transitions and being in public, which exacerbated Mother's instability.  *See id.* at 73.  The caseworker expressed concerns about how Mother and the Child would interact because the Child continued his treatment, but Mother did not.  *Id.*  Further, there was testimony that

although there were some improvements in Mother's interactions with the Child, there was still room for growth. ***See id.*** at 164. Additionally, Mother stopped attending family therapy with the Child in April 2023. ***See id.*** at 140.

The Agency referred Mother to Allegheny Family Network to have a family support partner, but Mother's services were closed out in May 2024 due to lack of communication and an inability to reach Mother as she was often out of town. ***See id.*** at 65, 116-18. Similarly, Foster Mother was appointed as the Child's secondary medical and educational decision maker because Mother was sporadically out of town and hard to contact. ***See id.*** at 106. Since that time, Mother has not participated in medical or educational services for the Child. ***See id.*** Additionally, as of the termination hearing, the Agency had no confirmation of Mother's housing. ***Id.*** at 69.

Therefore, there was competent evidence to support the determination that Mother's continued incapacity caused the Child to be without essential parental care and that Mother cannot or will not remedy the causes of her incapacity. Contrary to Mother's claims, the record reflects that Mother is not able to make "reasonably prompt assumption of full parental duties." ***A.H.***, 247 A.3d at 443 (citation omitted). Because the orphans' court's findings are

supported by the record, we must accept them. **_See T.S.M., supra_**. Mother's first issue merits no relief.[5]

We turn next to Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." **_In the Interest of K.T._**, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); **_see also C.M.K._**, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration'

---

[5] We need not address Mother's argument regarding Section 2511(a)(8) because we may affirm termination of her rights under any ground under Section 2511(a).

- 14 -

must be the child's 'developmental, physical and emotional needs and welfare.'" ***K.T.***, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." ***Id.*** at 1106 (citing ***T.S.M.***, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. ***Id.*** (citing ***T.S.M.***, 71 A.3d at 268; ***In re D.C.D.***, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's rights served the Child's needs and welfare. The court determined that "even if [the] Child has retained a bond with Mother[,] despite having not seen her in over 12 months, that bond is not necessary or beneficial, and [the] Child will not suffer extreme emotional consequences from termination[.]" O.C.O. at 20. The court concluded that "the record clearly established that it would harm [the] Child to continue his contact with Mother without her first demonstrating some renewed level of mental health stability." ***Id.*** Further, the court noted that "[the] Child has made tremendous progress in his pre[-]adoptive therapeutic foster home." ***Id.*** The Child has all his needs met by his foster family, appears bonded with them, and thrives in their home. ***See id.*** at 20-21.

On appeal, Mother argues that it was an abuse of discretion and/or an error of law that supported the orphans' court's finding under Section 2511(a). *See* Mother's Brief at 21. Thus, the orphans' court further erred as a matter of law by proceeding to a Section 2511(b) analysis and concluding that termination met the Child's needs and welfare. *See id.* Mother argues that she "had positive parenting skills and was able to communicate appropriately with [the Child]." *Id.* Further, Mother loves the Child and "has much to offer for his benefit." *Id.* Mother asserts that their relationship adds value to their lives, and termination would "unnecessarily and permanently deprive" the Child of this relationship which is not best for his needs and welfare. *Id.*

First, Mother is mistaken that the orphans' court committed an error of law by moving to the Section 2511(b) analysis. As discussed above, the orphans' court's findings under Section 2511(a) are supported by the record. Thus, having properly determined that termination was warranted under Section 2511(a), the orphans' court appropriately moved to the Section 2511(b) analysis.

The next part of Mother's argument fails because it focuses on Mother, not on the Child's needs and welfare. It is well established that Section 2511(b) is focused on the needs and welfare of the child. *See C.M.K.*, 203 A.3d at 261-62 (citation omitted). Mother's assertions, that she has positive parenting skills, was able to communicate appropriately with the Child, and

loves the Child, focus on Mother's actions and feelings, not on the Child's needs and welfare.

The rest of Mother's argument again fails to appreciate the standard of review we must apply in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record, even if the record could support an opposite result. *See T.S.M.*, 71 A.3d at 267 (citations omitted).

Here, the record supports the orphans' court's findings. As of the termination hearing, Mother had not visited with the Child in over a year, and the Child had not asked about Mother in approximately a year. N.T. at 160. Furthermore, the orphans' court suspended visits in August 2023 because it determined that visits would pose a "grave threat" to the Child due to Mother's mental health instability. *See* O.C.O. at 4, 7, 14, 17, 20. Additionally, there was ample testimony at the termination hearing that the Child is bonded with his foster family and is thriving in their care, with all his needs being met. *See* N.T. at 87-88, 106-09, 158, 160-62, 177-80. The Agency caseworker testified that removing the Child from the foster home would be a severe detriment to him. *Id.* at 108-09. The Child has special behavioral needs that the foster parents are aware of and equipped to handle. *Id.* at 180. Thus, the record supports the orphans' court's findings, and Mother's second issue merits no relief.

In sum, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Mother's parental rights under Section 2511(a)(2) and (b) of the Adoption Act.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/18/2025