J-A16027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF Z.A.N.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 361 EDA 2025 |

Appeal from the Decree Entered January 8, 2025
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2024-A0027

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED AUGUST 14, 2025**

In this matter, E.A.B. (Mother) appeals from the decree entered by the Montgomery County Court of Common Pleas, which granted the petition of the Montgomery County Office of Children and Youth (the Agency) and involuntarily terminated her parental rights to her now two-year-old son, Z.A.N.H. (the Child), pursuant to the Adoption Act.[1]  **See** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).  After review, we affirm.

---

[1] The Agency also filed a petition to terminate R.H.'s (Father's) parental rights to the Child.  Along with those petitions, the Agency filed separate petitions to terminate Mother's and Father's parental rights to another child, now three-year-old daughter, Z.V.H., who is not the subject of this appeal.  The orphans' court held a combined termination hearing related to both children and both parents.  Mother voluntarily relinquished her rights to Z.V.H. at the hearing, which the court accepted.  The court involuntarily terminated Father's parental rights to both children; he did not appeal either termination.  The court also changed the children's goals to adoption; neither parent appealed the goal change.  Although many aspects of this case involve both children, because
*(Footnote Continued Next Page)*

We discern the following factual history from the orphans' court's opinion. The Agency has been involved with this family since March 2022, after Z.V.H. was born.[2] The Agency received a report that Mother had tested positive for multiple drugs. The Agency was granted emergency protective custody of Z.V.H., and she remained placed with Maternal Grandmother.

Mother gave birth to the Child in March 2023 and entered the Libertae Family House treatment program with the Child shortly thereafter. However, on May 4, 2023, Mother left Libertae without completing the program and against medical advice. On August 16, 2023, the Child was adjudicated dependent, but physical custody remained with Mother. However, less than 10 days later, on August 25, 2023, Lansdale Police responded to a call at the home where Mother was living with the Child and a roommate. Mother was screaming with the Child on her lap. Mother stated that she was going to kill herself. The police transported Mother to Montgomery County Emergency Services for an involuntary mental health commitment.

Maternal Grandmother came to pick up the Child, and she took him to the home of close family friends who had offered to care for him. Thereafter, the Agency was granted emergency physical and legal custody of the Child.

_____

this appeal relates only to the Child and Mother, we focus our analysis on them.

[2] Mother and Father were previously involved with the Philadelphia Department of Human Services related to their two older daughters. Mother's and Father's parental rights to those two children were involuntarily terminated in 2022, and the children were adopted by Maternal Grandmother.

The Child remained placed with Maternal Grandmother's friends, who became his kinship foster parents.

Once the Child was removed, Mother's goals included housing, employment, maintaining sobriety, and addressing her mental health issues. The Agency filed a petition to involuntarily terminate Mother's parental rights on March 6, 2024, a little over six months after the Child entered foster care. The orphans' court held a termination hearing on May 23 and June 21, 2024.[3]

_____

[3] The Child (and his sibling) were represented by an attorney at the termination hearing. Counsel also filed a brief on the Child's behalf in this appeal.

Our Supreme Court has mandated that appellate courts *sua sponte* "verify that the orphans' court indicated that the attorney [in a dual role of guardian *ad litem* (GAL) and legal counsel] could represent the child's best interests and legal interests without conflict." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020); *see also* 23 Pa.C.S.A. § 2313(a). Counsel representing a child's legal interests must advocate for the child's preferred outcome even if counsel does not agree with it, whereas the GAL representing a child's best interests must express what the GAL "believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." *In re T.S.*, 192 A.3d 1080, 1082 n.2 (Pa. 2018) (citation omitted).

At the termination hearing, counsel acknowledged to the orphans' court that she had served as the Child's GAL in the dependency proceedings and had been appointed as legal counsel for the termination hearing. *See* N.T., 5/23/24, at 11. Counsel indicated that she understood the difference between serving as GAL and as legal counsel. *See id.* Counsel told the orphans' court that there was no conflict between the Child's best and legal interests because the Child was one year old and could not articulate his preferred outcome. *See id.* at 10, 12. In its opinion, the orphans' court expressly found that there was no conflict of interest between the best and legal interests of the Child, and counsel could act as a legal advocate for the Child. *See* Trial Court Opinion (T.C.O.), 1/8/25, at 3. Thus, we find that the orphans' court fulfilled
*(Footnote Continued Next Page)*

- 3 -

On the first day of the hearing, two police officers, Maternal Grandmother, the Agency caseworker, and Father testified; Mother testified on the second day. After taking the matter under advisement, on January 8, 2025, the orphans' court terminated Mother's and Father's parental rights.

Mother timely filed this appeal. She presents the following six issues for our review, which we reorder for ease of disposition and to align with the order Mother argues the issues in her brief:

1. Did the trial court err in finding that [Mother] evidenced a settled purpose of relinquishing her parental rights or failed to perform parental duties for the six months prior to filing the petition to involuntarily terminate parental rights?

2. Did the trial court err in finding that the [Mother] engaged in repeated and continued incapacity, abuse, neglect, or refusal that has caused the Child to be without essential parental care, control, or subsistence necessary for his well-being and that such conditions cannot or will not be remedied?

3. Did the trial court err in finding that the conditions leading to removal will continue to exist and that the parent cannot or will not remedy those conditions within a reasonable period of time and that the termination would best serve the needs and welfare of the Child?

4. Did the trial court err [in finding] that the developmental, physical, and emotional needs and welfare of the Child would be best served through termination?

_____

the mandate of **K.M.G.** and Section 2313(a). **See T.S.**, 192 A.3d at 1088 (recognizing that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously.") (citation omitted).

5. Did the trial court err in finding aggravating circumstances where it presided over a termination of parental rights hearing prior to the passage of one year where the petitioner failed to establish [Mother] possessed notice of those aggravating circumstances?

6. Did the trial court commit an abuse of discretion where it failed to deny the petition to terminate parental rights without prejudice where the [Agency] could not establish that [Mother] received notice of the prior petition to terminate parental rights leading to the finding of aggravated circumstances?

Mother's Brief at 4-5 (capitalization adjusted).

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive

case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Furthermore, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); *see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

As noted, the orphans' court terminated Mother's rights under Section 2511(a)(1), (2), (5), and (b). As we may affirm under any of the subsections of Section 2511(a), we review the court's decision as to Section 2511(a)(1). That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Here, the termination petition was filed on March 6, 2024; thus, the statutory timeframe to examine Mother's actions began on September 6, 2023. Our Supreme Court has "reinforce[d] the view that the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence . . . ." *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021) (citation omitted) (some emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent

to decide if the evidence, under the totality of the circumstances, requires involuntary termination." *In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009) (citing *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).

Regarding parental duties, we have explained that:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, . . . the parental obligation is a positive duty which requires affirmative performance.

*B.,N.M.*, 856 A.2d at 855 (citation omitted).

Furthermore,

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*Id.* (internal citations omitted).

Once a settled purpose of relinquishing parental rights or a failure to perform parental duties is established, "the court must engage in three lines of inquiry: (1) the parent's explanation for [the parent's] conduct; (2) the post-abandonment contact between [the] parent and [the] child; and (3)

consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **Charles E.D.M., II**, 708 A.2d at 92).

Here, the orphans' court determined that the Agency had proven the statutory grounds for terminating Mother's parental rights under Section 2511(a)(1). The court explained:

> With respect to birth mother, only the petition related to [the Child] remains pending. Birth mother, while she is on medication for anxiety and has had some periods of sobriety, has not adequately addressed either her mental health issues or her substance abuse issues.
>
> Throughout the period after her involuntary mental health commitment on August 25, 2023, she continued to experience housing instability and financial instability, taking numerous different jobs for short periods but being unable to maintain stability. She became incarcerated prior to the second hearing date, June 21, 2024, due to an allegation of assault and strangulation. She admitted to [the Agency caseworker] use of methamphetamines, not only at the time of the birth of [her daughter] Z.V.H. in March of 2022, but as recently as April of 2024.
>
> Birth mother was offered bi-weekly supervised visits with [the Child], and in addition to being inconsistent in attending visits, she never progressed to more frequent visits or to unsupervised visits. [Mother] had only a "handful" of visits with both children between January of 2024 and May of 2024, according to the testimony of the [M]aternal [G]randmother. Birth mother herself acknowledged that her last supervised visit with [the Child] before the hearing on May 23, 2024, was on April 10, 2024. She missed two scheduled visits in May of 2024, although she attended a pediatric visit on May 21, 2024 for [the Child].
>
> She appeared extremely late to court on May 23, 2024, arriving after 1 p.m. for a 9:30 a.m. hearing, and she appeared to be agitated. She had trouble remaining seated

and trouble waiting for a rescheduling order to be handed to her before she left the courtroom. In her testimony on June 21, 2024, she again appeared agitated and at times argumentative. [. . .]

[. . .]

Since August 25, 2023, neither of the birth parents has provided financial support to either of the children, neither of the birth parents has provided physical or emotional care and support on a regular basis to either of the children. Because of their frequent missed visits and their inability to progress to unsupervised visits, neither of the birth parents has established and maintained a consistent parental relationship with either of the children and neither of the birth parents has maintained a parental bond with either of the children.

In addition to establishing an incapacity of each of the birth parents to parent, the evidence produced also establishes that while birth parents have not indicated a settled purpose of relinquishing a parental claim, they have failed to perform parenting responsibilities for a period of more than six months preceding the filing of the petitions for termination of parental rights.

[. . .]

With respect to [the Child], since August 25, 2023, both birth parents have had few and inconsistent supervised visits with [the Child]. Neither parent has progressed to having unsupervised visits with [the Child]. Neither parent has been able consistently to visit with [the Child], neither parent has provided for [the Child] emotionally, physically or financially. Importantly, both birth parents candidly acknowledged that neither of them has achieved financial stability, housing stability or job stability. And neither parent has adequately addressed their goals of substance abuse recovery, mental health treatment and avoiding arrests related to anger issues.

With respect to [the Child], these facts indicate to me by clear and convincing evidence that [Mother] and [Father] are not capable of performing minimal parental duties. [. .

.] Further, th[e orphans' c]ourt finds that [the Agency] has established by clear and convincing evidence, as discussed at length above, grounds for termination of the rights of [Mother] and [Father] to [the Child] under the following sections of the statute: section 2511(a)(1), because of the failure of the parents to perform parental duties for a period of 6 months preceding the filing of the petitions for termination of parental rights [. . . .]

Trial Court Opinion (T.C.O.), 1/8/25, at 22-26.

Once the orphans' court received Mother's concise statement of matters complained of on appeal, the court wrote an Appellate Rule 1925(a) opinion, further explaining its reasoning. The court noted:

As discussed expressly and at length in [the orphans' court's] Opinion dated January 8, 2025, th[e orphans' c]ourt made extensive findings of fact regarding Birth Mother's failure to address her mental health issues and substance abuse issues and her homelessness, so that she could provide a safe, stable and nurturing home for [the Child]. Birth Mother was offered bi-weekly, supervised visits with this [C]hild, but attended visits inconsistently, and she had only a handful of visits with [the Child] between January of 2024 and May of 2024, according to the clear and convincing testimony. Birth Mother never progressed to having unsupervised visits with this [C]hild.

[The orphans' court] expressly found that Birth Mother has failed or refused to perform parental duties with respect to [the Child] during the six-month period immediately preceding the filing of the [termination] petition [. . .]. In her Concise Statement of Matters Complained of on Appeal, Birth Mother contests a finding that she evidenced a settled purpose of relinquishing a parental claim to the [C]hild. [The orphans' court] did not make this finding. Rather, the [orphans' court] found, based upon all of the clear and convincing evidence presented at trial, that Birth Mother failed or refused to perform parental duties for at least the six-month period applicable under the statute. [. . .]

> [The orphans' court] recognizes that [Mother] loves her [C]hild, and made no finding that she evidenced a settled purpose of relinquishing her parental claim to [the Child]. However, the statute provides an alternate basis for termination of parental rights where it is established that the birth parent has failed or refused to perform parental duties for the six-month period preceding the filing of the petition for termination of parental rights. The [orphans' court] found in this case that the [Agency] had established, by clear and convincing evidence, that [Mother] has failed or refused to perform parental duties with respect to this [C]hild for that six-month period before the filing of the petition for termination of parental rights. Throughout this period, the evidence demonstrated that [Mother] continued to experience housing insecurity, financial and employment insecurity, failed to address her mental health issues and substance abuse issues, and failed to cooperate with [the Agency] in providing drug screens. Birth Mother also admitted to the [Agency] caseworker on April 10, 2024, that if she provided a drug screen it would be positive for a controlled substance. Consequently, she failed to provide a stable and safe home, and failed to contribute funds, clothing, or other items necessary for the well-being of [the Child]. Birth Mother also had few and inconsistent visits with her son, [the Child] during the six-month period prior to the filing of the petition for termination of parental rights.

T.C.O., 2/11/25, at 2-3.

On appeal, in her first issue, Mother argues that the Agency failed to meet its burden under Section 2511(a)(1). Mother's Brief at 11. Mother asserts that she loves the Child and acted with the settled purpose of remaining his mother. *Id.* She took affirmative steps to maintain a place in the Child's life, including complying with her goals and maintaining a loving bond with the Child. *See id.* Mother argues that she regularly visited with the Child. *Id.* at 12. During the visits, she cared for the Child, was appropriate and affectionate with him, and the Child looked to her to meet his needs. *Id.*

Before the Child was adjudicated dependent, Mother ensured that he was healthy and well cared for. *Id.* Thus, Mother claims that she took every opportunity afforded to her to parent the Child and never displayed a settled purpose of relinquishing her parental rights. *Id.*

Mother's argument fails to appreciate our standard of review in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M.*, 71 A.3d at 267 (citation omitted).

Additionally, as noted by the orphans' court, Mother's arguments related to whether she evidenced a settled purpose of relinquishing her parental rights are not relevant to our analysis. Instead, the orphans' court found that for the six-month statutory period at issue (September 2023 to March 2024), Mother refused or failed to perform parental duties.

Our review of the record supports the orphans' court's decision. In the six-month statutory period, Mother never progressed past supervised visits with the Child, and her last visit was on April 10, 2024. *See* N.T., 5/23/24, at 147-48. At the April 10 visit, the caseworker testified that Mother started talking to herself, and the police were called because Mother reached into the caseworker's purse and removed paperwork. *See id.* at 145, 148, 207; N.T., 6/21/24, at 73. Mother was supposed to have a visit on May 8, 2024, but she was incarcerated. *See* N.T., 5/23/24, at 148-49. Mother was also supposed to have a visit the day before the termination hearing, and, although she

confirmed her attendance, she did not attend. *Id.* at 149. Instead, Mother texted the caseworker the morning of the visit that she would not be attending and stated, "he's better off without me." *Id.* at 149-50. Maternal Grandmother testified that from January 2024 to the termination hearing in May 2024, Mother only had a "handful" of visits with the children. *See id.* at 90-91.

Although Mother attended the Child's doctor's appointment on May 21, 2024, this occurred well after the termination petition was filed. *See* N.T., 6/21/24, at 41; 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). The caseworker testified that this was the first doctor's appointment Mother attended since the Child was removed. *See* N.T., 5/23/24, at 206-07. This was also the first time Mother had met the Child's foster parents. *See* N.T., 6/21/24, at 43.

In the six-month statutory period, Mother never had stable housing for the Child; she was mainly living on the street. *See* N.T., 5/23/24, at 139. Maternal Grandmother testified that, outside of a few brief times, she had not had a solid address for Mother in three years. *See id.* at 71. Mother admitted to living in multiple places during the six-month period including: a house that was the subject of a raid, a stairwell, a tent, and a hotel paid for by someone

else. *See* N.T., 6/21/24, at 26, 29-30. When asked where she would go upon being released from incarceration, Mother named at least three different places. *See id.* at 63-64, 69. Mother admitted that if she did not have a safe place to live, the Child would stay with the foster family, or she would go into a program. *See id.* at 99-100; *B.,N.M.*, 856 A.2d at 855 (noting that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.") (citation omitted).

Mother also had inconsistent employment. *See* N.T., 5/23/24, at 141. The caseworker believed that Mother had not been employed during the six-month period because she had not received documentation regarding Mother's employment since August or September 2023. *See id.* Mother testified to a litany of jobs that she supposedly had during that period, but most of them lasted for only a few weeks, and there were gaps in her employment. *See* N.T., 6/21/24, at 19, 27-28, 30-34. Thus, Mother was unable to provide financial stability for the Child. *See* N.T., 5/23/24, at 167.

Although not argued by Mother under this subsection, we acknowledge that parental rights "shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). However, the orphans' court's opinion makes clear that it did not terminate Mother's rights solely because of her housing and financial

situation. Furthermore, Mother's situation was not beyond her control as two police officers, Maternal Grandmother, and the Agency caseworker all testified to services that they offered Mother. Mother either refused most of the services or was inconsistent in using the services. Indeed, the caseworker testified that all services had been closed out due to the parents' failure to comply. *See* N.T., 5/23/24, at 130-31, 204. Mother testified to voluntarily leaving multiple jobs after only short periods of time, including jobs that were providing her with housing. *See* N.T., 6/21/24 at 19, 27, 30-34, 37.

Mother also testified to having had up to five phone numbers in the past two years. *See id.* at 90. She testified that her cell phone got confiscated in a raid in October 2023 and she lost all contact with the Agency "again" for "probably the fifth time." *Id.* at 26. Later in her testimony, she admitted that she had not had much contact with the Agency caseworker, and they lost contact for two months, but Mother claimed that the caseworker was not answering or would cancel visits. *See id.* at 41. Mother admitted that she did not have a phone at the time of the termination hearing because it was broken. *See id.* at 38. She also did not have a current driver's license. *See id.* at 76. Maternal Grandmother testified to having twenty-one different phone numbers for Mother in the past three years, and Mother had twelve Facebook pages in the six weeks before the termination hearing. *See* N.T., 5/23/24, at 71. The Agency caseworker testified to having four different cell

phone numbers for Mother in the two weeks before the termination hearing began. *Id.* at 142.

Thus, there was competent evidence to support the orphans' court's conclusion that Mother refused or failed to perform parental duties during the six-month statutory period because "she failed to provide a stable and safe home, and failed to contribute funds, clothing, or other items necessary for the well-being of [the Child]." T.C.O., 2/11/25, at 3; *see also Interest of A.M.*, 256 A.3d 1263, 1270–71 (Pa. Super. 2021) (noting that "where a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for her to be capable of performing her parental duties and responsibilities.") (citation omitted).

We acknowledge that there was contrary testimony. However, we reiterate that the orphans' court was free to make all credibility determinations and resolve conflicts in the evidence. *See M.G.*, 855 A.2d at 74 (citation omitted). We cannot now reweigh the evidence. Because the orphans' court's findings are supported by the record, we must accept them. *See T.S.M., supra*. We discern no error of law or abuse of discretion with the orphans' court's decision under Section 2511(a)(1).[4]

---

[4] Mother's second and third issues challenge the orphan court's decision under Section 2511(a)(2) and (5). As we may affirm the court's decision under any subsection of Section 2511(a), we need not reach Mother's second and third issues.

Mother's fourth issue challenges the orphans' court's findings under Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child) (citation omitted).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *K.T.*, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *Id.* at 1106 (citing *T.S.M.*, 71 A.3d at 267). Our

Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. *Id.* (citing *T.S.M.*, 71 A.3d at 268; *In re D.C.D.*, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's parental rights best served the Child's needs and welfare. The court explained:

> [B]irth mother has been unable to sustain a consistent parental role with [] [the Child], and has been so inconsistent with her visits, that there is no longer any parental bond between birth mother and [the Child].
>
> [S]ince August 25, 2023, neither birth mother nor birth father has provided for [the Child] financially, neither has consistently visited with the [C]hild, and neither has developed and maintained a secure and consistent parent-child relationship. The desire of each of these parents to start over and begin to meet the needs of these children at some date in the future is insufficient to meet each child's ongoing needs for consistent and reliable love, affection and responsibility. I conclude that the emotional needs and welfare of the child can best be met by [. . .] termination of the parental rights of both birth father and birth mother with respect to [the Child], and I conclude that neither of the children will suffer a detriment as a result of termination of the parental rights of his or her birth father and birth mother.
>
> In this case, I find that there is no parental bond between birth mother and [the Child] [. . .].
>
> Therefore, I find from the evidence and testimony that termination of birth mother and birth father's rights will best serve the needs and welfare of the children and termination of the parental rights of birth mother and birth father will not irreparably harm the children.

T.C.O., 1/8/25, at 29-30.

On appeal, Mother argues that the orphans' court "failed to consider whether a natural parental bond existed between Mother and Child and whether the termination would destroy this necessary and beneficial relationship." Mother's Brief at 17 (citation omitted). Mother asserts that a clear, strong, and loving bond exists between her and the Child. *Id.* Mother regularly attended visits with the Child, was appropriate with him, and responded to his needs. *See id.* The Child looked to Mother to address his needs, and she provided love and security to him. *See id.* Mother argues that before the Agency removed the Child, she provided for all his needs. *See id.* at 17-18. After the Child was removed, Mother attended one of his doctor's appointments. *See id.* at 18. Additionally, Mother showed love and affection for the Child, and the Child reached for her and clung to her. *See id.* Thus, severing the bond between Mother and the Child would be detrimental to the Child's wellbeing. *Id.*

Mother's argument again fails to appreciate our standard of review. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M., supra*.

Contrary to Mother's assertion, the orphans' court's opinion makes clear that it considered whether a bond existed between Mother and the Child and the impact of terminating that bond. However, the court found that no bond existed between Mother and the Child; termination would serve the needs and

welfare of the Child; and termination would not irreparably harm the Child. *See* T.C.O., 1/8/25, at 29-30. Further, Mother's assertions that she met all the Child's needs before he was removed are irrelevant because our focus is on the current bond, if any, between the Child and Mother.

Here, the record supports the orphans' court's findings. The Child was removed from Mother when he was approximately five months old, and he has remained in the same kinship placement ever since. As noted, Mother never progressed past supervised visits with the Child. As of the day the termination hearing began, May 23, 2024, the last visit Mother had with the Child was on April 10, 2024, although she attended his doctor's appointment on May 21, 2024. *See* N.T., 5/23/24, at 148, 206; N.T., 6/21/24, at 41, 77. Mother was supposed to have a visit the day before the hearing, and after confirming her attendance, she did not show up. *See* N.T., 5/23/24, at 149. Instead, Mother texted the caseworker the morning of the visit and said, "he's better off without me." *Id.* at 150.

The caseworker believed that it was in the Child's best interests for Mother's parental rights to be terminated. *See id.* at 166. The caseworker did not believe that the Child would be irreparably harmed if Mother's rights were terminated. *Id.* at 167. The caseworker testified that although Mother had a bond with the Child for the five months he was in her care and the Child recognized Mother during visits, he did not cry when the visits were over. *See*

*id.* at 167. The caseworker stated that the relationship between Mother and the Child was not a parent/child bond. ***See id.*** at 168.

Additionally, the caseworker testified that the Child's kinship foster home is pre-adoptive. ***Id.*** at 151. The Child looks to his foster parents to meet all his needs including feeding, emotional, and social needs. ***Id.*** at 152. The Child's needs are met in the foster home, which is a safe, stable, and loving home. ***See id.*** at 152, 211.

Maternal Grandmother testified that her relationship with the Child's foster parents was "awesome." ***Id.*** at 65. They have become one big family. ***Id.*** at 65-66. Maternal Grandmother anticipated that the Child and his siblings would continue to have ongoing contact with each other. ***See id.*** at 66.

Although we acknowledge Mother's arguments that the Child reaches for her and clings to her, we note that Mother testified to those facts at the termination hearing. However, as noted above, the testimony of other witnesses differed. We reiterate that the orphans' court, as the finder of fact, was free to believe all, part, or none of the evidence presented and was free to make credibility determinations and resolve evidentiary conflicts. ***See M.G., supra***. The court clearly credited the caseworker's and Maternal Grandmother's testimony because it found that there was no bond between Mother and the Child. We must defer to this credibility determination because it is supported by the record; we are not entitled to reweigh the evidence. ***See T.S.M., supra***. Mother's challenge to Section 2511(b) merits no relief.

Mother addresses her final two issues together in her brief. She argues that the orphans' court "violated [her] due process rights when it permitted the Agency to proceed on its petition under the premise of aggravating circumstances when the [C]hild had been in Agency care for six months and six days, as opposed to fifteen months." Mother's Brief at 18 (citation omitted). Mother asserts that for the Agency to proceed to termination that quickly, it must establish aggravated circumstances. *See id.* The Agency admitted, over objection, evidence that Mother's parental rights to the two older children were involuntarily terminated in Philadelphia County. *See id.* at 19. Mother asserts that this was an error and a violation of her due process rights because the Agency could not establish that she received notice of the prior termination proceedings. *See id.*

Mother's argument misapprehends the law and is belied by the record. Mother cites Section 6351(f)(9) of the Juvenile Act to support her assertion that the Child needed to be in Agency care for fifteen months before the Agency could file a termination petition, unless aggravated circumstances existed. However, Section 6351(f) provides for matters that courts must determine at permanency hearings. *See* 42 Pa.C.S.A. § 6351(f). One of those matters, pursuant to subsection (9), is whether an agency has filed or joined a termination of parental rights petition if a child has been in placement for at least 15 of the last 22 months, unless certain requirements are met. *See* 42 Pa.C.S.A. § 6351(f)(9). Thus, that "subsection aims not to protect

the parent from the premature filing of a termination petition but rather to determine why a petition has not been filed for a child who was been in foster care for an extended time." *In re Adoption of S.E.G.*, 901 A.2d 1017, 1027 (Pa. 2006) (citation omitted); *see also D.C.D.*, 105 A.3d at 674–75 ("[T]he statutory language ensures that termination petitions are timely filed. Specifically, if a child has been in custody for 15 of the last 22 months, the court must inquire as to whether a termination petition has been filed, absent the listed exceptions of subsections (i)-(iii) . . . . Requiring a court to inquire whether an agency has filed for termination promotes timely permanency for children rather than subjecting them to foster care drift.") (citation omitted). This aligns with Pennsylvania's "goal of finding permanency for children in less than two years, absent compelling reasons." *T.S.M.*, 71 A.3d at 632 (citations omitted). Thus, contrary to Mother's assertion, Section 6351(f)(9) does not require an agency to wait 15 months to file a termination petition, if the conditions for termination under Section 2511(a) of the Adoption Act are fulfilled earlier.

Indeed, Section 2511(a)(1) and (5), two of the subsections the Agency filed the instant termination petition under, specify a six-month timeframe for termination, if the requirements of those subsections are met. *See* 23 Pa.C.S.A. § 2511(a)(1), (5). Thus, the Agency was not required to either: 1) wait for the Child to be in foster care for 15 months before filing its termination petition, or 2) prove aggravated circumstances to proceed with termination

before 15 months. If the Agency could meet its burden for termination under any subsection of Section 2511(a), the orphans' court could grant its petition.

Further, Mother's arguments related to aggravated circumstances are misplaced. She argues that the Agency could not show that she received notice of the prior involuntary termination proceedings in Philadelphia involving her other children. However, this is not the appropriate proceeding to bring such an argument. Instead, Mother should have challenged her lack of notice before the prior case concluded. However, Mother does not argue that she appealed from, or otherwise challenged, the prior termination orders on any ground, including lack of notice.

Alternatively, Mother could have argued that she did not have notice of the prior involuntary termination proceedings when the orphans' court found aggravated circumstances against her in December 2022 related to Z.V.H. The record reflects that the Agency filed for, and the court found, aggravated circumstances related to the Child's sibling, Z.V.H., in December 2022. *See* N.T., 5/23/24, at 119. We see no evidence in the record, and Mother cites none, that shows the Agency also filed for aggravated circumstances related to the Child. Moreover, at the termination hearing, the Agency did not argue that the orphans' court should find aggravated circumstances related to the Child.

Perhaps most importantly, the orphans' court's January 8, 2025 opinion does not discuss aggravated circumstances or indicate that aggravated

circumstances were the reason it terminated Mother's parental rights to the Child. Instead, the orphans' court recounted, at length, the evidence that supported its termination decree.

At the hearing, Mother's counsel objected to the admission of the prior involuntary termination orders from Philadelphia County based on relevance and due process. *See id.* at 107-08. The orphans' court overruled the objection, finding that the orders were relevant "because under the Juvenile Act, a prior termination of parental rights needs aggravated circumstances. And we do have a permanency review hearing as well[.]" *Id.* at 109. Further, during the hearing, the Agency caseworker testified that there were prior involuntary terminations, that afterwards the Agency filed for aggravated circumstances related to the Child's sibling, and that the court ultimately found aggravated circumstances. *See id.* at 118-19. However, Mother's counsel did not object to the caseworker's testimony. *See id.* Mother also testified that she was involved with the Philadelphia welfare system, and the case officially closed out on August 29, 2022. *See* N.T., 6/21/24, at 94. She stated that the aggravated circumstances for the Child were not the same as they were for two of the other children. *See id.* Notably, the court never found aggravated circumstances existed for the Child.

Additionally, Mother's due process argument is not fully developed. She makes broad assertions about a parent's constitutional right to parent, and she asserts that due process requires that she had notice of the prior

involuntary terminations. *See* Mother's Brief at 19. To support this argument Mother cites the Fourteenth Amendment of the United States Constitution; Article 1, Section 9 of the Pennsylvania Constitution; and *McLaughlin v. Nahata*, 260 A.3d 222, 235 (Pa. Super. 2021).

We fail to see how these authorities apply to this situation. Article 1, Section 9 of the Pennsylvania Constitution relates to the rights of accused in criminal prosecutions. It goes without saying that this termination proceeding was not a criminal prosecution. And the *McLaughlin* case did not involve a termination of parental rights; it involved indemnification and contribution related to an underlying medical malpractice action. Mother does not explain why or how these authorities are relevant here. Mother's challenges related to aggravated circumstances and due process merit no relief.

In sum, we discern no abuse of discretion or error of law in the orphans' court's decision to terminate Mother's parental rights under Section 2511(a)(1) and (b) of the Adoption Act.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/14/2025